JEFFER MANGELS BUTLER & MITCHELL LLP
STANLEY M. GIBSON (Bar No. 162329)
*sgibson@jmbm.com*
ROD S. BERMAN (Bar No. 105444)
*rberman@jmbm.com*
JESSICA BROMALL SPARKMAN (Bar No. 235017)
*jbromall@jmbm.com*
LENA STREISAND (Bar No. 339021)
*lstreisand@jmbm.com*
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-4308
Telephone:  (310) 203-8080
Facsimile:   (310) 203-0567

Attorneys for Plaintiff PAIGE, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| PAIGE, LLC, a California limited liability company, | Case No. 2:22-cv-07800-HDV-SK |
|---|---|
| Plaintiff, | **DECLARATION OF JESSICA BROMALL SPARKMAN IN SUPPORT OF PLAINTIFF PAIGE, LLC'S MOTION FOR EQUITABLE RELIEF AND ATTORNEYS' FEES AND COSTS** |
| v. | |
| SHOP PAIGE LLC, a New York limited liability company; and DOES 1 through 10, inclusive, | |
| Defendants. | The Hon. Hernán D. Vera |
| | Date:  May 30, 2024<br>Time:  10:00 a.m.<br>Ctrm.:  5B |

I, Jessica Bromall Sparkman, declare as follows:

1.    I am an attorney duly admitted to practice before this Court. I am a partner with Jeffer Mangels Butler & Mitchell LLP ("JMBM"), attorneys of record for PAIGE, LLC ("Paige" or "Plaintiff"). I have personal knowledge of the facts set forth herein or knowledge from JMBM's files in this matter. If called as a witness, I could and would competently testify to the matters stated herein. I make this declaration in support of Plaintiff's Motion for Equitable Relief and Attorneys' Fees and Costs.

**Defendant's Unreasonable Behavior in Negotiations re Equitable Relief**

2. On Thursday, February 29, 2024, I met and conferred with Defendant's counsel Brian Bloom and Michael Trauben via Zoom regarding the issues of equitable relief and attorneys' fees.

3. During our discussion, Mr. Bloom informed me that Defendant interpreted the Court's February 16, 2024, Order Granting Motion for Summary Judgment, Dkt. No. 83 (the "MSJ Order") as applying only to Defendant's use of a font similar to that used by Paige in its stylized version of its PAIGE mark. The only support offered for this position was to point out the Court's references to the striking similarities between the parties' respective stylized marks. In view of its interpretation of the MSJ Order, Defendant would not stipulate to an injunction that prohibited its used of SHOP**PAIGE** and would only agree to an injunction limited to the stylized SHOP**PAIGE** logo mark. Mr. Bloom indicated he was preparing a proposal for our review and that he would send it to us the following week.

4. During this conference, Mr. Bloom also advised that because Ms. Restivo was not personally named, in the event of any monetary judgment against Defendant, Defendant intended to simply go out of business ("tank the company") rather than pay and any judgment received would be one Plaintiff's "could wipe themselves with."

5. On Tuesday, March 5, 2024, I wrote to Mr. Bloom, confirming our discussion and laying out the reasons that Defendant's interpretation of the MSJ Order was not supported by the text of the MSJ Order itself. I also provided a proposed Stipulation for Entry of Judgment and a [PROPOSED] Judgment & Permanent Injunction. True and correct copies of my March 5, 2024 email and the proposed Stipulation for Entry of Judgment and a [PROPOSED] Judgment & Permanent Injunction are attached hereto as Exhibits A and B. In the proposed stipulation, Plaintiff proposed disgorgement of only the amount of profits Defendant claimed to have in its (inadmissible expert report).

SPARKMAN DECL. ISO REQUEST FOR EQUITABLE RELIEF AND ATTORNEYS' FEES

6. I followed up with Mr. Bloom on Friday, March 8, 2024, by email, and asked when he would either respond to Plaintiff's proposal for a proposed Stipulation for Entry of Judgment and a [PROPOSED] Judgment & Permanent Injunction or provide the proposal he had referred to during the February 29, 2024 meet and confer. Mr. Bloom advised that he was in the process of finalizing a proposal to stipulate and would provide it the following week. Attached hereto as Exhibit C are true and correct copies of email reflecting this correspondence.

7. On Monday, March 11, 2024, Mr. Bloom's assistant Lisa Niewdach sent Defendant's "settlement proposal." The proposal was adapted from a mediator's proposal made following the parties' November 8, 2023 mediation. A true and correct copy of Defendant's Proposal is attached as Exhibit D.

8. I informed Defendant's counsel that if Defendant would not agree to a resolution that prohibited the continued use of SHOP**PAIGE**, the parties were at an impasse. Mr. Bloom responded on March 14, 2024. He did not state whether Defendant would agree to a resolution that included cessation of the use of SHOP**PAIGE**, but nonetheless suggested that that the parties return to mediation before the magistrate judge. On March 19, 2024, I again asked Mr. Bloom to state whether Defendant was open to a resolution that prohibited further use of SHOP**PAIGE** and informed him that we need to know that to determine whether further mediation may have value. Attached hereto as Exhibit E are true and correct copies of email reflecting this correspondence.

9. On March 20, 2024, Mr. Bloom responded that Defendant was open to a resolution that prohibited use of SHOP**PAIGE** and that it would like to return to mediation before the magistrate. My colleague Rod Berman responded to Mr. Bloom that same day and asked to discuss Defendant's proposal. Mr. Bloom and Mr. Berman then arranged to have a call on Monday, March 25, 2024. Mr. Berman asked that Mr. Bloom provide a redline of the proposed Stipulation for Entry of Judgment and a [PROPOSED] Judgment & Permanent Injunction to inform their

1  discussion. Mr. Bloom did not provide a redline and advised that he needed to
2  reschedule the call. On March 26, 2024, Mr. Berman followed-up about the redline
3  and rescheduling the call. Mr. Bloom did not respond. Mr. Berman followed-up
4  again on March 29, 2024. Mr. Bloom eventually proposed a call on Tuesday, April
5  2, 2024. He also informed us that he would not be providing a redline but instead
6  simply wanted to discuss a proposal. Attached hereto as Exhibit F are true and
7  correct copies of email reflecting this correspondence.

8      10.    On Tuesday, April 2, 2024, Mr. Bloom and I had a Zoom meeting and
9  discussed Defendant's proposal. While Defendant's proposal did include an
10 agreement not to use SHOP**PAIGE**, it allowed for a full year to rebrand and
11 required that Plaintiff pay Defendant $240,000. I told Mr. Bloom that he should put
12 his proposal in writing and that I would present it to our client, but that any
13 requirement for a payment to Defendant was likely a deal-breaker. Mr. Bloom sent
14 Defendant's written proposal on Thursday, April 4, 2024. Mr. Berman responded to
15 the proposal inquiring if payment of money to Defendant was a deal-breaker. Mr.
16 Bloom indicated that Defendant would require a payment if the settlement would
17 require her to rebrand. Mr. Berman responded that the parties' appeared to be at an
18 impasse. Attached hereto as Exhibit G are true and correct copies of email reflecting
19 this correspondence.

### Miscellaneous Matters

22     11.    Defendant continues to use SHOP**PAIGE** in the exact same manner as
23 it did prior to issuance of the Court's MSJ Order. Attached hereto as Exhibit H are
24 true and correct copies of printouts from Defendant's website and social media
25 dated May 2, 2024 and April 17, 2024, evidencing its continued use of
26 SHOP**PAIGE**.

12. Attached hereto as Exhibit I are a true and correct copies of excerpts from Dkt. No. 54-4, the Declaration of Walter Lacher submitted in support of Plaintiff's MSJ.

13. Attached hereto as Exhibit J are true and correct copies of excerpts from Dkt. No. 54-4, the Declaration of Lena Streisand submitted in support of Plaintiff's MSJ and the exhibits references therein.

14. Attached hereto as Exhibit K are true and correct copies of the relevant portion of Defendant's responses to Plaintiff's second set of interrogatories.

15. Attached hereto as Exhibit L are true and correct copies of the relevant portion of Defendant's responses to Plaintiff's requests for admissions.

16. Attached hereto as Exhibit M, is a true and correct copy of document produced by Defendant and bearing Bates Number SPNY000184.

17. Attached hereto as Exhibit N are true and correct copies of excerpts from Dkt. No. 30-2, the Declaration of Jessica Bromall Sparkman submitted in support of Plaintiff's motion to compel.

18. Attached hereto as Exhibit O are true and correct copies of excerpts from the Joint Stipulation filed in connection with Plaintiff's motion to compel, Dkt. No. 30-3.

19. Attached hereto as Exhibit P is a true and correct copy of the Magistrate Judge's original order on Plaintiff's motion to compel, Dkt. No. 32.

20. Attached hereto as Exhibit Q are true and correct copies of excerpts from Dkt. No. 35-2, the Declaration of Jessica Bromall Sparkman submitted in support of Plaintiff's Request for Reconsideration of the Magistrate's denial of its motion to compel as moot. After service of Plaintiff's motion to compel production of its financial information, Defendant produced unverified profit and loss statements for 2021 and 2022, just two of the five years that had been requested. Only after Plaintiff sought reconsideration of the Magistrate's judge's denial of its

1  motion to compel as moot, and only after being ordered to do so by the magistrate
2  judge, did Defendant produce any financial information for 2018, 2019, and 2020.

3      21.    Attached hereto as Exhibit R are true and correct copies of extracts
4  from the Joint Brief re Plaintiff's Motion for Summary Judgment, Dkt. No. 54.

5      22.    Defendant did not timely respond to Plaintiff's first, second, and third
6  sets of interrogatories, or its second set of document request. Responses to
7  Plaintiff's second requests for production and interrogatories were due on August
8  24, 2023. An extension until September 4, 2023, was requested and granted. Again,
9  no discovery responses were served. Plaintiff's counsel requested a conference of
10 counsel on September 8, 2023. Receiving no response, counsel followed up on
11 September 11, 2023. Defendant's counsel offered to speak on September 15, 2023.
12 On September 15, 2023, counsel agreed to serve responses by September 27, 2023.
13 Defendant eventually served responses on September 28, 2023. Responses to
14 Plaintiff's third request interrogatories were due on October 2, 2023. An extension
15 until October 5, 2025 was requested and granted. Responses to interrogatories were
16 not served until October 11, 2023.

17     23.    Defendant made its expert disclosures, due on October 13, 2023, on
18 January 11, 2024, months after the close of discovery. Defendant failed to respond
19 to Plaintiff's Statements of Undisputed Facts in connection with Plaintiff's summary
20 judgment motion. Defendant failed to file a Memorandum of Contentions of Fact
21 and Law. Defendant failed to file a Witness List. Defendant refused to agree to a
22 bench trial, but failed to prepare proposed jury instructions or *voir dire* questions.

### Defendant's Unreasonable Behavior In Settlement Negotiations

25     24.    In June 2023, Defendant proposed that the parties have a mediation the
26 week of July 24, 2023. Plaintiff agreed, proposed mediators, obtained their
27 availability, and provided Defendant with proposed dates and times for mediation.
28 Thereafter, Defendant's counsel advised that its "client believes that it will be more

1  fruitful and cost effective to mediate before the Magistrate in September."
2  Defendant's counsel indicated that it believed that Plaintiff's responses to discovery
3  would be helpful in reaching resolution. Plaintiff let Defendant's counsel know that
4  it remained open to an earlier mediation and that it would also be open to providing
5  information informally if that would aid resolution. Defendant's counsel never
6  advised what information it needed. Attached hereto as Exhibit S are true and
7  correct copies of email reflecting this correspondence.

8        25.    On July 21, 2023, Plaintiff made a settlement proposal. Defendant's
9  only response was to say "This is rejected. We will proceed with discovery." True
10 and correct copies of email correspondence reflecting the foregoing discussions are
11 attached hereto as Exhibit T.

12       26.    On August 23, 2023, in advance of mediation before Hon. Judge Kim,
13 Plaintiff made a further settlement proposal. Parties' met via Zoom to discuss
14 settlement on August 31, 2023 but no progress was made. Defendant provided
15 neither a substantive response or a concrete counter offer to Plaintiff in response to
16 Plaintiff's proposal. After many follow-ups by Plaintiff's counsel, on October 23,
17 2023, Defendant finally responded. True and correct copies of email correspondence
18 reflecting the foregoing discussions are attached hereto as Exhibit U.

19       27.    Mediation was delayed from September 13, 2023 to November 8, 2023.
20 On September 7, 2023, Hon. Judge Kim ordered that, in addition to Plaintiff's co-
21 founder and Chief Financial Officer Walt Lacher, who was long-scheduled to attend
22 the September 13, 2023 mediation, Plaintiff's co-founder and creative director Paige
23 Adams-Geller also attend the mediation (we understand at Defendant's urging). Ms.
24 Adams-Geller was overseas attending events relating to a store opening in London
25 at the time of the mediation. The mediation was postponed until November 8, 2023,
26 so that Ms. Adams-Geller could attend as ordered by the Magistrate judge.

**Personal Attacks on Ms. Adams-Geller**

28. The parties mediated, unsuccessfully, before Magistrate Judge Steve Kim on November 8, 2023. On November 9, 2024, Judge Kim circulated a mediator's proposal, a true and correct copy of which is attached hereto as Exhibit V. Among other things, the proposal barred continued use of SHOP**PAIGE** by Defendant and required Plaintiff to reimburse Defendant for up to $75,000 of rebranding expenses. Plaintiff accepted the proposal. Defendant rejected it.

29. On November 9, 2024, Ms. Restivo created a GoFundMe fundraiser entitled "PAIGE DENIM Targeting My Small Business." Attached hereto as Exhibit W is a true and correct copy of the print out of the GoFundMe. The GoFundMe includes a number of inaccuracies. It states that Plaintiff "issued a cease and desist order, demand that I immediately change my name and pay them $100k under the threat of a lawsuit." In fact, Plaintiff sent a cease and desist letter to Defendant on September 16, 2022. The letter did not include any demand for payment; only a demand that Defendant cease its infringing conduct.

30. Ms. Restivo also asserted "Paige Denim has already extinguished several small business with the name "PAIGE" involved, leaving a trail of despair. . . . . [Paige's] aim is to expand into jewelry, obliterate my business and erase my existence from the market." Paige is not trying to put anyone out of business; just conducting routine trademark enforcement. While several business may have changed their name in response to Paige's routine enforcement activities, we are not aware that companies that have gone out of business. Ms. Restivo was in touch with one company that changed its name from PAIGE COLLECTIVE to WORTH COLLECTIVE. To date, as far as I know, that company is still in business operating under the name WORTH COLLECTIVE.

31. The GoFundMe was promoted on Ms. Restivo's personal TikTok and Instagram pages. On November 10, 2023, Paige's Instagram and Facebook pages, as well as Ms. Adams-Geller's personal Instagram page were flooded with attacks and

negative comments. Commentors posted on nearly all of the posts on both pages for at least the last several years – including posts in which Ms. Adams-Geller was discussing her experience with sexual assault. The posting continued for days. Each comment resulted in a notification to Ms. Adams-Geller. Ms. Adams-Geller had to take her Instagram page private to avoid further harassment. The comments were so disruptive to Paige's company Instagram page that it had to disable comments, which is a significant disruption to its Instagram operations. Many of the comments echo the (inaccurate) statements made by Ms. Restivo in the GoFundMe and other commentary she has posted online. Many of the commentors were Ms. Restivo's friends and/or Defendant's employees. True and correct copies of printouts showing these comments are attached hereto as Exhibit X.

32. Ms. Restivo appeared in a live video on TikTok a recently as April 18, 2024, stating that the case was not resolving because Plaintiff's attorneys were putting off calls (which is false), and stating that she is going to sue Paige to recover her fees.

**Plaintiff's Attorneys' Fees**

33. JMBM has performed legal services in the above-captioned matter for Paige. These services were billed to Paige. Services were provided by firm attorneys including by: me (intellectual property and litigation partner), Rod S. Berman (litigation partner and Intellectual Property Department Chair), Stanley M. Gibson (litigation partner and Patent Litigation Group Chair ), associate attorneys Lena Streisand, Jon Ustundag, Danika Duffy, and Celine Ohanian, and litigation support specialist Chris Piccirillo.

34. JMBM has offices located in Los Angeles, Orange County, and San Francisco, California. It has between 110 and 125 attorneys.

35. The legal services provided to Paige were billed on an hourly basis using the firm's customary hourly rates for the services provided. Hourly rates

were generally increased for all clients in January 2023 and again in January 2024. Records of the time billed to Paige were kept in the firm's customary manner, through its electronic timekeeping and accounting systems.

36. The hourly rates charged to Paige for the services of individuals mentioned in Paragraph 32 are as follows:

| Name | 2022 | 2023 | 2024 |
|---|---|---|---|
| Rod Berman (partner/IP Department Chair) | $850 | $895 | $925 |
| Jessica Bromall Sparkman (partner) | $735 | $785 | $825 |
| Stan Gibson (partner/Patent Litigation Group chair) | N/A | $945 | $995 |
| Lena Streisand (associate) | N/A | $515 | $575 |
| Celine Ohanian (associate) | N/A | N/A | $495 |
| Jon Ustundag (associate) | $475 | N/A | N/A |
| Danika Duffy (associate) | $475 | N/A | N/A |
| Chris Piccirillo (Practice Support Specialist) | N/A | $375 | $385 |

37. These rates were charged to and paid by Paige in connection with this matter.

38. I am a partner in the Intellectual Property Group at JMBM. I work in JMBM's Los Angeles office. I started working at JMBM in September 2004 as an associate attorney. I was promoted to partner effective January 1, 2014. I received my J.D. from the University of Southern California in 2004 and B.A. from Yale University in 2001. I am admitted to practice before numerous U.S. District Courts and the Ninth Circuit Court of Appeals. I specialize in trademark and intellectual property litigation and counseling, and have served as counsel on numerous trademark cases. I am admitted to practice law in numerous U.S. District Courts, the Ninth Circuit Court of Appeals, and the U.S. Court of Appeals for the Federal Circuit. A copy of my relevant biography, including representative experience, is attached hereto as Exhibit Y.

39. From the inception of the matter through the completion of this motion, I worked (or expect to work) approximately 300.8 hours on the litigation, which were (or, for the hours worked in May 2024, will shortly be) billed to Paige. I directed and worked on all aspects of this litigation, including: litigation strategy and analysis, preparation of the complaint, preparing and responding to discovery, briefing discovery motions, attending to document production, reviewing document production and other evidence, drafting a summary judgment motion and reply and declarations in support, preparing for hearing on summary judgment, preparing mediation briefs, settlement analysis and discussions, attending to expert issues and strategy, legal research relating to all aspects of the case, attending to numerous discovery disputes and issues, drafting motion for equitable relief and attorneys' fees and supporting evidence.

40. Rod S. Berman is a partner in JMBM's Los Angeles office and is the Chair of the Intellectual Property Department. A copy of Mr. Berman's relevant biography is attached hereto as Exhibit Z. As detailed in the attached biography, Mr. Berman is a recognized expert in trademark litigation and counseling. He received his J.D. from Loyola Law School, *cum laude*, in 1982, his M.S. from Indiana University, and B.S. from the University of California, Los Angeles. Mr. Berman is admitted to practice law in numerous U.S. District Courts, the Ninth Circuit Court of Appeals, the U.S. Court of Appeals for the Federal Circuit, the Supreme Court, and the U.S. Patent and Trademark Office.

41. Mr. Berman directed and participated in all aspects of this litigation, including: litigation strategy, summary judgment briefing and argument, settlement, expert issues, and mediation. From the inception of this matter until present, Mr. Berman worked (or expects to work) approximately 58.7 hours on the litigation that were billed (or, for the hours worked in July 2024, will shortly be) to Paige.

42. Stanley M. Gibson is a partner in JMBM's Los Angeles office and is the Chair of the firms' Patent Litigation Group. He is an experienced trial lawyer

with extensive experience litigating trademark cases. He received his J.D. from Duke University School of Law in 1991, his M.A. from Duke University in 1991, and his B.A. from the University of California, Berkley in 1988. A copy of his biography, including representative experience, is attached hereto as Exhibit AA.

43. Mr. Gibson is lead trial counsel and directed and participated in all aspects of this litigation, including: litigation strategy, summary judgment briefing and argument, discovery strategy, expert matters, and trial preparation and strategy. From the inception of this matter until present, Mr. Gibson worked (or expects to work) approximately 26.3 hours on the litigation that were billed (or, for the hours worked in July 2024, will shortly be) to Paige.

44. Lena Streisand is an associate in JMBM's Los Angeles office. She graduated from The George Washington University School of Law *with honors* and received her B.A. from The University of California Boulder, *summa cume laude*. A copy of her biography is attached hereto as Exhibit AB.

45. Ms. Streisand has participated in many aspects of this litigation, including, in particular: summary judgment briefing, preparation of discovery requests and responses, document production, attending to numerous discovery disputes and issues, expert discovery issues, and trial preparation. From the inception of this matter until present, Ms. Streisand worked (or expects to work) approximately 180.1 hours on the litigation that were billed (or, for the hours worked in July 2024, will shortly be) to Paige.

46. Celine Ohanian is an associate in JMBM's Los Angeles office. She graduated from the University of Southern California Gould School of Law in 2023 and received her B.A., *summa cum laude*, from the University of California, Los Angeles, in 2019. A copy of her biography is attached hereto as Exhibit AC. Ms. Ohanian provided 1.5 hours of legal research assistance in this matter.

47. Danika Duffy and Jon Ustundag were associate attorneys in JMBM's Los Angeles office in 2022. Ms. Duffy worked 1.9 hours that were billed to Paige

for preparing the complaint and associated documents. Mr. Ustundag worked 6.2 hours that were billed to Paige for preliminary investigation and preparation of cease and desist letter to Defendant.

48. Chris Piccirillo is a litigation practice support specialist at JMBM. Mr. Piccirillo worked 4.3 hours that were billed to Paige, primarily in connection with compiling evidence from Defendant's social media and processing documents for review and production.

49. Based upon my experience, the rates charged by JMBM, including the rates charged in this case, are in line with, and in many cases lower than, the majority of JMBM's peer firms in the Los Angeles market with lawyers of similar experience, skill, and credentials.

50. JMBM has been counsel to Paige in trademark counseling, enforcement, and litigation matters for more than two decades. JMBM managed all aspects of the litigation.

51. A true and correct copy of JMBM's contemporaneous billing records for 2022 are attached hereto as Exhibit AD. For 2022, the breakdown of hours worked is as follows. Approximately 19.8 hours (3.2 by Berman; 8.5 by Sparkman; 1.9 by Duffy; 6.2 by Ustundag) were spent in connection with preliminary investigation and analysis of Defendant, preparing the cease and desist letter analyzing the response to the cease and desist letter, preparing, filing, serving, and chasing Defendant to answer the complaint, and communication with the client regarding the same.

52. A true and correct copy of JMBM's contemporaneous billing records for 2023 are attached hereto as Exhibit AE. For 2023, the breakdown of hours worked is as follows.

    a. Approximately 34.5 hours (5.6 by Berman; 18.1 by Sparkman; 4.9 by Gibson; 5.9 by Streisand) were spent in connection with miscellaneous strategy, scheduling, and correspondence with client and opposing counsel.

1         b.     Approximately 7.1 hours (1.2 by Berman; 5.7 by Sparkman; .2 by Gibson) were spent in connection with the Rule 26(f) meeting and Joint 26(f) report.

        c.     Approximately 32 hours (2.1 by Berman; 13.5 by Sparkman; 15.8 by Streisand; .6 by Piccirillo) were spent in connection the preparation of discovery requests and deposition notices to Defendant and review of responses and evidence in response to same.

        d.     Approximately 48 hours (4.1 by Berman; 38.2 by Sparkman; 5.7 by Streisand) were spent in connection with efforts to obtain discovery responses and documents from Defendant, including numerous meet and confer correspondences and conferences and a motion to compel.

        e.     Approximately 44.7 hours (.8 by Berman; 13.9 by Sparkman; 27 by Streisand; and 3 by Piccirillo) were spent in connection with responding to Defendant's discovery requests and searching for and producing documents in response to same.

        f.     Approximately 33.3 hours (2.6 by Berman; 10.9 by Sparkman; .5 by Gibson; 19.3 by Streisand) were spent in connection with expert strategy and discovery issues.

        g.     Approximately 105.8 hours (5.3 by Berman; 58.6 by Sparkman; .8 by Gibson; 41.1 by Streisand) were spent in connection with Plaintiff's motion for summary judgment.

        h.     Approximately 46 hours (13.7 by Berman; 30.1 by Sparkman; .2 by Gibson; 2 by Streisand) were spent in connection with issues relating to settlement and mediation, including preparing a profits analysis, settlement proposals, mediation briefing, and scheduling matters.

        i.     Approximately 7.9 hours (.2 by Berman; 1 by Sparkman; 2.2 by Gibson; 4.5 by Streisand) were spent in connection with issues relating to trial strategy and preparation.

   j. Approximately 15.8 hours (1.3 by Berman; 14.4 by Sparkman; and .1 by Streisand) were spent in connection with monitoring social media for client and Defendant following social media attack on Plaintiff and Ms. Adams-Geller by Defendant and its friends, employees, and/or social media followers.

  53. A true and correct copy of JMBM's contemporaneous billing records for 2024 are attached hereto as Exhibit AF.  The numbers below account for hours through the date of filing, but invoices for April and May have not yet been generated. If necessary, invoices will be provided as soon as they are available. For 2024, the breakdown of hours worked is as follows.

   a. Approximately 13.7 hours (1.6 by Sparkman; 2.2 by Gibson; 9.9 by Streisand) were spent in connection with expert disclosure and discovery matters, including reviewing and moving to strike Defendant's (months) late expert disclosure.

   b. Approximately 27.9 hours (10.9 by Berman; 13.6 by Sparkman; 2 by Gibson; 1.4 by Streisand) were spent in connection with matters relating to Plaintiff's motion for summary judgment, including preparing for and attending oral argument and reviewing order granting same.

   c. Approximately 67.6 hours (.8 by Berman; 11.7 by Sparkman; 12.2 by Gibson; 41.4 by Streisand; and 1.5 by Ohanian) were spent in connection with trial strategy and preparation matters.

   d. Approximately 74 hours (6.9 by Berman; 61 by Sparkman; 1.1 by Gibson; 5 by Streisand; .7 by Piccirillo) were spent in connection preparing proposed stipulated injunction, negotiations with Defendant and its counsel regarding same, and briefing the instant motion.

  54. I anticipate working at least an additional 10 hours in connection with a reply brief, that Mr. Berman will work at least 1 additional in connection with a reply brief, that Ms. Streisand will work at least 2 additional hours in connection with a reply brief.

55. In total, JMBM performed (or will perform) 579.8 hours of work, for $417,100.50 in fees.

56. Paige also engaged Forrest A. Vickery, ASA, to provide an expert report and testimony on financial and damages issues. Mr. Vickery's CV is attached hereto as Exhibit AG. Mr. Vickery billed Paige $35,660.75 in connection with work performed in this matter. True and copies of his invoices are attached hereto as Exhibit AH.

57. In total, Paige incurred (or will incur) $417,100.50 in attorneys' fees, and $35,660.75 in reasonably incurred expert fees, for a total of $452,761.25.

58. In my experience, it is typical for a trademark infringement lawsuits to cost in excess of $1.5 million in fees through trial and in excess of $500,000 in fees through summary judgment.

I declare that the foregoing is true and accurate under the laws of the United States of America.

Executed this 2nd day of May, 2024.

*s/ Jessica Bromall Sparkman*
Jessica Bromall Sparkman