# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAIGE, LLC, | |
|     Plaintiff, | |
| v. | Civil Action No. 2:22-cv-07800-HDV-SK |
| SHOP PAIGE LLC, and DOES 1 through 10, inclusive, | |
|     Defendants. | |

# Expert Report of Barry L. Bell

January 11, 2024



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

# Table of Contents

Introduction ......................................................................................................................................... 1

  Qualifications ..................................................................................................................................... 1

  Scope of Retention and Compensation ............................................................................................ 1

  Information Considered ..................................................................................................................... 2

Summary of Opinions ......................................................................................................................... 2

Background .......................................................................................................................................... 3

  The Parties ......................................................................................................................................... 3

    Paige, LLC ....................................................................................................................................... 3

    Shop Paige LLC ............................................................................................................................... 4

  The PAIGE Mark ................................................................................................................................. 4

  The Dispute ........................................................................................................................................ 6

  The Apparel Industry ......................................................................................................................... 8

  The Retail Jewelry Industry .............................................................................................................. 10

Discussion and Analysis of Damages and Disgorgement ................................................................... 12

  Assumptions .................................................................................................................................... 12

  Remedies for Trademark Infringement ........................................................................................... 12

  Paige's Claimed Damages and Disgorgement ................................................................................. 13

    Overview of Disgorgement Claim ................................................................................................ 13

    Issues with Mr. Vickery's Disgorgement Methodology and Conclusions .................................... 14

      Failed to Tie Any Shop Paige Sales to Use of the PAIGE Mark .................................................. 14

      Failed to Deduct Expenses ........................................................................................................ 15

      Conclusion on Disgorgement Claim ........................................................................................... 16

    Overview of Actual Damages Claim ............................................................................................. 16

    Issues with Mr. Vickery's Actual Damages Methodology and Conclusions ................................. 16

      No Evidence of Past Licensing, Licensing Negotiations, or an Intent to License ........................... 17

      No Context for the Factors Impacting a Royalty Negotiation .................................................... 18

      No Basis to Establish Comparability of Purportedly Comparable Licenses ................................. 20

        Failed to Identify Selection Criteria ......................................................................................... 20

        Failed to Disclose any Meaningful Analysis of the Agreements ............................................. 20



Failed to Provide any Evidence of any of the Agreements' Comparability............................ 21

Royalty Damages Conclusion ......................................................................................... 27

Royalty Damages Overlap with Disgorgement ............................................................ 28

Prejudgment Interest ..................................................................................................... 28

Other Issues .................................................................................................................... 28



# Introduction

## Qualifications

1.    I am the founder of, and a managing director with, Echelon Analytics, a specialized consulting firm that provides economic and financial analyses, forensic investigations, damages assessments, valuation services, and expert witness services primarily in the context of commercial disputes and litigation. The firm's clients range from small businesses to some of the largest global companies in the world.

2.    For more than 30 years, I have provided consulting services to clients involved in commercial disputes across a wide array of industries. I have prepared expert reports and provided expert testimony in numerous matters before state and federal courts and in arbitration. Prior to founding Echelon in 2010, I provided similar dispute-related services for more than 16 years at Navigant Consulting and its predecessor entity Peterson Consulting at increasing levels of responsibility from consultant to director. I then became a managing director at another global consulting firm, FTI Consulting, where I provided clients with similar dispute-related services for more than two years.

3.    I graduated magna cum laude with a Bachelor of Science degree in business administration and a major in finance from Tennessee Technological University in June 1989. In May 2007, I earned a Master of Business Administration degree with honors from the Cox School of Business at Southern Methodist University. I am a Certified Licensing Professional, a Certified Patent Valuation Analyst, and a Certified Fraud Examiner. My professional biography at <u>Exhibit A</u> provides additional information on my education and experience, including expert testimony over the last four years and publications and presentations over the last ten years.

## Scope of Retention and Compensation

4.    Shop Paige LLC has retained me to analyze, and potentially to provide testimony related to, damages claimed by Paige, LLC due to alleged trademark infringement by Shop Paige as discussed more fully below. Further, I have been asked to consider and evaluate the analysis and conclusions disclosed in the October 13, 2023, Expert Report of Forrest A. Vickery, Paige's retained damages expert.



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

5.      Echelon's compensation for services provided in this matter is based on hourly rates, ranging from $235 to $695, for professionals who perform consulting services related to this matter under my direction and supervision. Echelon is charging $695 per hour for time I spend consulting and assessing damages and for time that I may spend providing testimony related to my opinions. Neither Echelon's compensation from Shop Paige nor my compensation from Echelon is contingent upon the outcome of this litigation.

**Information Considered**

6.      In performing my review and analysis to arrive at the opinions expressed herein, I have relied upon my skills, knowledge, education, experience, and training, which are summarized in <u>Exhibit A</u>. Additionally, I have considered information from a variety of sources, including financial and other information produced by the parties in this litigation; discussions with Shop Paige founder Paige Restivo; and information that I and/or persons working under my direction obtained through independent research. The information I have considered through the date of this report is listed in <u>Exhibit B</u>.

7.      I understand that additional relevant information may become available after the date of this report. My work is continuing, and I reserve the opportunity to revise and/or supplement this report based on additional information received or to respond to issues raised by the parties, their witnesses, or the Court.

8.      This report is intended to be used solely in this litigation and should not be relied upon for any other purpose. If I provide deposition, affidavit, declaration, or trial testimony, such testimony may also supplement the opinions expressed herein. I may also prepare or assist in the preparation of demonstrative exhibits related to my analysis and opinions. The exhibits and schedules accompanying this report, including all footnotes and source notations, are integral parts of this report.

## Summary of Opinions

9.      Based on my work through the date of this report and the information available to me as identified in <u>Exhibit B</u>, I have formed the following opinions, which are discussed in detail later in this report:



- The amount of Shop Paige's purportedly unjust enrichment to be disgorged is at most $20,045. Additionally, I have seen no evidence that 100 percent of Shop Paige's sales from its inception can be attributed to its alleged infringement of the PAIGE mark.

- Mr. Vickery failed to identify the criteria used to select the 16 purportedly comparable agreements, failed to disclose any meaningful analysis of the agreements, and failed to provide any evidence of any of the agreements' comparability with a hypothetical Paige/Shop Paige license covering the PAIGE mark. As a result, his reasonable royalty opinion does not assist the trier of fact in quantifying Paige's actual damages, if any.

## Background

**The Parties**

**Paige, LLC**

10.   Founded in 2004, Paige "started as a women's denim brand" and eventually expanded into "a lifestyle collection for men and women," including blouses, dresses, and outerwear, among other men's and women's clothing items.[1] Paige sells its products under its PAIGE mark online through its website located at www.paige.com and dedicated retail locations in Arizona, California, Nevada, New York, Tennessee, Texas, and the United Kingdom as well as third-party retailers, such as Nordstrom and Saks.[2]

---

[1] "About," Paige [https://www.paige.com/about].

[2] "Homepage," Paige [https://www.paige.com/]; "Visit Us," Paige [https://www.paige.com/stores]; Complaint, October 26, 2022, 6.



*Expert Report of Barry L. Bell*                                    ***Paige, LLC v. Shop Paige LLC***

**Shop Paige LLC**

11.    Founded in 2018 by Paige Elisia Restivo, Shop Paige is a jewelry brand retailer.[3] Shop Paige sells its jewelry under its SHOPPAIGE mark online through its website located at shoppaigeny.com, a dedicated retail location in Greenvale, New York, and pop-up events.[4]

**The PAIGE Mark**

12.    Paige has multiple PAIGE marks registered with the United States Patent and Trademark Office related to belts, candles, clothing, eyewear-related products, purses, satchels, and shoes, as shown in Table 1 below. Per data in the USPTO database, Paige first used a PAIGE mark in commerce in 2005.[5]

---

[3] "About Us," Shop Paige [https://shoppaigeny.com/pages/about-us].

[4] "Homepage," Shop Paige [https://shoppaigeny.com/]; "Locations," Shop Paige [https://shoppaigeny.com/pages/locations]; Defendant Shop Paige LLC's Responses and Objections to Plaintiff Paige, LLC's Interrogatories to Defendant Shop Paige LLC (Set One), May 16, 2023, 5; Discussion with Paige Restivo.

[5] See Table 1.



*Expert Report of Barry L. Bell*                                                    *Paige, LLC v. Shop Paige LLC*

**Table 1. The PAIGE Mark USPTO Summary** [6]

| Mark | Application Filing Date | First Use in Commerce | Registration Date | Registration Number | International Class(es) | For |
|---|---|---|---|---|---|---|
| PAIGE | Jul 8, 2004 | Feb 28, 2006 | Oct 9, 2007 | 3308211 | 018 | Satchels |
| PAIGE | Jul 8, 2004 | Jan 17, 2005 | Oct 25, 2011 | 4046193 | 025 | Clothing, namely, jeans, pants, leggings, skirts, dresses, shirts, t-shirts, tank tops, jackets |
| PAIGE | Aug 23, 2011 | Sep 16, 2005 | Apr 17, 2012 | 4128766 | 025 | Shorts |
| PAIGE | Apr 19, 2012 | Apr 27, 2011 | Nov 06, 2012 | 4237703 | 025 | Shoes |
| PAIGE | Nov 20, 2017 | Nov 1, 2017 | Jul 24, 2018 | 5523189 | 018, 025 | Belts of leather, suede, imitation leather, and non-leather fabrics; Purses, all-purpose carrying bags, clutches, and handbags of leather, suede, imitation leather, and non-leather fabrics |
| PAIGE | Jan 21, 2016 | Jan 5, 2016 | Feb 26, 2019 | 5682917 | 004, 025 | Candles; Belts |
| PAIGE | Nov 15, 2018 | Nov 1, 2005 | Jul 9, 2019 | 5798838 | 035 | Retail store services featuring clothing, footwear, apparel accessories, handbags, and jewelry |
| PAIGE | Dec 5, 2019 | Dec 3, 2019 | Mar 12, 2020 | 6053489 | 025 | Socks |
| PAIGE | Apr 20, 2016 | Feb 4, 2022 | Apr 05, 2022 | 6694369 | 009 | Sunglasses; eyewear; eyewear accessories, namely, eyeglass cases |

13.    The PAIGE mark itself "consists of standard characters without claim to any particular font style, size, or color."[7] Paige states that it "often displays the PAIGE Mark in a distinctive elongated, block letter, all capital sans serif font," as shown in Figure 1 below.[8]

---

[6] United States Patent and Trademark Office, Trademark Electronic Search System report [https://tmsearch.uspto.gov/search/search-information].

[7] United States Patent and Trademark Office, Trademark Electronic Search System report [https://tmsearch.uspto.gov/search/search-information].

[8] Complaint, October 26, 2022, 5.



**Figure 1. The PAIGE Mark** [9]



## The Dispute

14.   Shop Paige has marketed and sold jewelry under two marks. A graphic artist designed the initial mark, as shown in Figure 2 below, on September 1, 2018, using the GOBOLD font, which was available for free download from 1001freefonts.com.[10]

**Figure 2. The Initial SHOPPAIGE Mark** [11]



15.   On February 7, 2022, Shop Paige submitted an application with the USPTO to register its SHOPPAIGE NEW YORK BY PAIGE ELISIA mark for its use in International Class 14 for jewelry, namely, rings, necklaces, earrings, bracelets, and anklets.[12] As shown in Figure 3 below, the mark itself does not consist of standard characters, but is rather "an illustration drawing which includes

---

[9] Complaint, October 26, 2022, 5.

[10] Defendant Shop Paige LLC's Responses and Objections to Plaintiff Paige, LLC's Interrogatories to Defendant Shop Paige LLC (Set One), May 16, 2023, 5.

[11] Defendant Shop Paige LLC's Responses to Plaintiff Paige, LLC's Requests for Admission (Set One), October 5, 2023, 14-15.

[12] United States Patent and Trademark Office, Trademark Electronic Search System report [https://tmsearch.uspto.gov/search/search-information].



word(s)/letter(s)/number(s)."[13] On November 14, 2022, the USPTO received a letter of protest against the SHOPPAIGE NEW YORK BY PAIGE ELISIA mark based on the PAIGE mark.[14]

**Figure 3. The Current SHOPPAIGE Mark** [15]



16.    On September 16, 2022, Paige sent Shop Paige a cease-and-desist letter related to alleged trademark infringement of its PAIGE mark.[16] Specifically, the letter addressed

> Shop Paige, LLC ("Shop Paige") applying for a stylized mark for SHOPPAIGE NEW YORK BY PAIGE ELISIA (the "SHOPPAIGE Mark") in connection with retail jewelry stores, online retail stores featuring jewelry in Class 35, and jewelry, namely, rings, necklaces, earrings, bracelets, anklets in Class 14 ("the '578 Application") and using the SHOPPAIGE Mark in connection with sale of jewelry.[17]

Paige requested that "Shop Paige voluntarily abandon its trademark application and agree to forever not use or seek to register anywhere the PAIGE mark alone or as part of a trademark, e.g., SHOPPAIGE NEW YORK BY PAIGE."[18]

17.    On October 26, 2022, Paige filed suit against Shop Paige alleging trademark infringement, unfair competition, false advertising, federal trademark dilution, cyberpiracy, common law trademark

---

[13] United States Patent and Trademark Office, Trademark Electronic Search System report [https://tmsearch.uspto.gov/search/search-information].

[14] Elizabeth O'Brien (Office of the Deputy Commissioner for Trademark Examination Policy), letter to Examining Attorney, November 14, 2022 [SPNY 000628].

[15] Complaint, October 26, 2022, 5.

[16] Rod S. Berman, letter to Paige Restivo, September 16, 2022 [9.22.2022 C&D Letter(170489671.1).pdf].

[17] Rod S. Berman, letter to Paige Restivo, September 16, 2022, 1 [9.22.2022 C&D Letter(170489671.1).pdf].

[18] Rod S. Berman, letter to Paige Restivo, September 16, 2022, 2 [9.22.2022 C&D Letter(170489671.1).pdf].

infringement, and unfair business practices.[19] Paige is seeking a preliminary and permanent injunction, a finding against Shop Paige for all of Paige's causes of action, general and/or specific damages, Defendants' profits traceable to Defendants' conduct, treble damages, statutory damages, a transfer of domain name, restitution, destruction of all materials bearing the allegedly infringing marks, and costs and attorneys' fees.[20]

### The Apparel Industry

18.  The apparel industry includes "clothing that is produced for private end customers."[21] It can be divided into segments based on a variety of factors, including by men, women, and children and then by clothing type, such as coats and jackets, blazers, suits, dresses, and skirts, etc.[22] The industry has been "characterized by short product lifecycles that have even been lowered in recent years due to the rise of fast fashion retailers."[23] Figure 4 below shows apparel sales by segment in the United States for the last five years.

---

[19] Complaint, October 26, 2022, 1, 9-19.

[20] Complaint, October 26, 2022, 19-22.

[21] "Apparel: market data & analysis," 2023, Statista [https://www.statista.com/study/55501/apparel-market-data-and-analysis/].

[22] "Apparel: market data & analysis," 2023, Statista [https://www.statista.com/study/55501/apparel-market-data-and-analysis/].

[23] "Apparel: market data & analysis," 2023, Statista [https://www.statista.com/study/55501/apparel-market-data-and-analysis/].



*Expert Report of Barry L. Bell*                                        **Paige, LLC v. Shop Paige LLC**

**Figure 4. United States Apparel Sales** [24]
**2018 through 2022**



19.  The apparel industry is "highly competitive."[25] Competitors can include "local, national, and global department stores, specialty and discount store chains, independent retail stores, and online businesses that market similar lines of merchandise."[26] Many factors impact competition among apparel retailers, including, among others:

- changing apparel trends and customer demands;

- attracting customer traffic both in stores and online;

- product pricing and customer perception of value;

- brand recognition and marketing to diverse market segments and geographic locations;

---

[24] "Market Insights: Apparel United States," Statista [https://www.statista.com/outlook/cmo/apparel/united-states].

[25] The Gap, Inc. Form 10-K for the fiscal year ended January 28, 2023, 9. See, also, American Eagle Outfitters, Inc. Form 10-K for the fiscal year ended January 28, 2023, 12 and Levi Strauss & Co. Form 10-K for the fiscal year ended November 27, 2022, 12.

[26] The Gap, Inc. Form 10-K for the fiscal year ended January 28, 2023, 9. See, also, American Eagle Outfitters, Inc. Form 10-K for the fiscal year ended January 28, 2023, 12 and Levi Strauss & Co. Form 10-K for the fiscal year ended November 27, 2022, 12.



- changing customer shopping preferences and practices, including the increasing shift to digital brand engagement, social media communication, and online shopping;

- product quality that appeals to customers of varying demographics and tastes;

- purchasing and stocking merchandise to match seasonal weather patterns and reacting to shifts in weather that impact consumer demand;

- sourcing and allocating merchandise; and

- improving processes in order to deliver cost savings to fund growth.[27]

**The Retail Jewelry Industry**

20.   The retail jewelry industry "involves a discretionary purchase where most of the merchandise is not branded, and the purchase cycle can stretch to years."[28] The industry includes jewelry and watches with jewelry accounting for the vast majority of sales.[29] According to Signet Jewelers, a worldwide jewelry retailer, jewelry accounts for approximately 85 percent of the United States market.[30] Figure 5 below shows jewelry retail sales in the United States for the last ten years.

---

[27] The Gap, Inc. Form 10-K for the fiscal year ended January 28, 2023, 9-10, 58. See, also, American Eagle Outfitters, Inc. Form 10-K for the fiscal year ended January 28, 2023, 12, 15 and Levi Strauss & Co. Form 10-K for the fiscal year ended November 27, 2022, 12.

[28] Signet Jewelers Limited Form 10-K for the fiscal year ended January 28, 2023, 13.

[29] Signet Jewelers Limited Form 10-K for the fiscal year ended January 28, 2023, 18.

[30] Signet Jewelers Limited Form 10-K for the fiscal year ended January 28, 2023, 8, 18.



*Expert Report of Barry L. Bell*                                                    *Paige, LLC v. Shop Paige LLC*

**Figure 5. United States Jewelry Retail Sales** [31]
**2013 through 2022**



21.  The retail jewelry industry is "highly fragmented and competitive."[32] Competitors can include "specialty jewelers, as well as other retailers that sell jewelry, including department stores, mass merchandisers, discount stores, apparel and accessory fashion stores, brand retailers, online retail and auction sites, shopping clubs, home shopping television channels, and direct home sellers."[33] Jewelry retailers compete based on many factors, including, among others:

- merchandising, including "[m]erchandise selection, innovation, availability and value";

- marketing and advertising, which "generates customer awareness, drives purchase considerations, and over time strengthens consumer lifetime value and drives share growth";

- trademarks and trade names;

---

[31] "Retail sales of jewelry in the United States from 2006 to 2022," Statista [https://www.statista.com/statistics/982039/retail-sales-jewelry-us/].

[32] Signet Jewelers Limited Form 10-K for the fiscal year ended January 28, 2023, 8. See, also, Birks Group Inc. Form 10-K for the fiscal year ended March 25, 2023, 22.

[33] Signet Jewelers Limited Form 10-K for the fiscal year ended January 28, 2023, 8. See, also, Birks Group Inc. Form 10-K for the fiscal year ended March 25, 2023, 22.



- availability of financing;

- supply chain;

- customer service and relationship building; and

- pricing relative to other retail categories and competitors.[34]

## Discussion and Analysis of Damages and Disgorgement

### Assumptions

22.   While I have extensive experience in analyzing damages in commercial litigation matters, including those involving the causes of action alleged against Shop Paige in this matter, I am not an attorney. Thus, I have not been requested to form, and I have not formed, any legal opinions or opinions related to any liability-related issue in this matter. My evaluation and quantification of Paige's claimed damages and disgorgement in this matter rely upon legal constructs and assumptions provided to me by counsel for Shop Paige.

23.   My analysis assumes that Paige, as the owner of the PAIGE mark, has standing to bring this litigation and that the PAIGE mark is valid, enforceable, and infringed by Shop Paige. I further understand that if the trier of fact determines that Shop Paige bears no liability under any of the causes of action alleged, no damages or disgorgement quantification is necessary.

### Remedies for Trademark Infringement

24.   Remedies for trademark infringement include recovery of the infringer's profits related to the infringement, actual damages sustained by the owner of the trademark, and the cost of bringing the action.[35] Assuming Shop Paige has infringed the PAIGE mark, Paige is entitled to pursue recovery of any profits Shop Paige has earned due to its alleged infringement of the PAIGE mark and Paige's actual damages, to the extent those two damages components do not overlap. The calculation of a trademark

---

[34] Signet Jewelers Limited Form 10-K for the fiscal year ended January 28, 2023, 8-9, 12-13, 18, 21, 28. See, also, Birks Group Inc. Form 10-K for the fiscal year ended March 25, 2023, 9, 12, 22, 24.

[35] See, e.g., 15 U.S.C. § 1117(a).



owner's actual damages may take different forms, including lost profits, reduced market value, royalties, and/or other compensation for lawful use of the mark, among other metrics.

## Paige's Claimed Damages and Disgorgement

25.   Mr. Vickery, Paige's retained damages expert, summarized his scope of analysis and opinions, stating:

> Based on [15 U.S.C. § 1117(a)] and the information provided as of the date of this report (as discussed above), I performed two calculations: (1) a calculation of Defendant's sales between September 2018 and approximately May 2023; and (2) a reasonable royalty based on a reasonable amount the Defendant would have paid the Plaintiff to license use of Paige, LLC's Paige Mark at the time the alleged infringement took place by Shop Paige LLC.[36]

26.   I further discuss Mr. Vickery's assumptions, methodology, and conclusions below.

### <u>Overview of Disgorgement Claim</u>

27.   For Paige's disgorgement claim related to Shop Paige's purported unjust enrichment, Mr. Vickery limited his work to entail a quantification of only Shop Paige's total sales revenue over the September 2018 through May 2023 period.[37] He quantified total aggregate sales to be $2,383,598 and total aggregate nets sales (excluding shipping and taxes) to be $2,127,003.[38] Despite acknowledging that he had reviewed evidence of Shop Paige's expenses, he chose not to quantify deductible expenses but appears to provide conflicting reasons for this choice. First, he stated:

> As of the date of this report, discovery is ongoing, and depositions of individuals from Shop Paige LLC have not been taken. Therefore, currently I have incomplete information on all elements of cost or deduction that may be claimed related to the alleged infringing sales. I reserve the right to amend my opinions in this report as well as the determination of Defendant's profits after

---

[36] Vickery Report, 20.

[37] Vickery Report, 2.

[38] Vickery Report, 32, Schedule 1.



receiving additional cost and expense information that may be appropriate to the calculation of Defendant's profits.[39]

28.    Later, he implied that because Shop Paige bears the burden to prove deductible expenses, he elected not to address them, stating, "Per 15 U.S. Code § 1117 (a), 'In assessing profits the plaintiff shall be required to prove defendant's sales only.'"[40]

### Issues with Mr. Vickery's Disgorgement Methodology and Conclusions

#### *Failed to Tie Any Shop Paige Sales to Use of the PAIGE Mark*

29.    Mr. Vickery's opinion on Paige's disgorgement claim began and ended with a summation of Shop Paige's total sales over the September 2018 through May 2023 period, completely agnostic as to whether any of those sales were related in any way to Shop Paige's alleged infringement of the PAIGE mark. While the plaintiff's burden in disgorgement inquiry related to trademark infringement is limited to quantifying the defendant's sales, the quantified sales are not properly calculated in a vacuum; there should be some evidence linking them to use of the asserted mark.

30.    Paige has used its mark in commerce related to belts, candles, clothing (jeans, pants, leggings, skirts, dresses, shirts, t-shirts, tank tops, jackets), purses, retail store services, satchels, shoes, socks, and sunglasses/eyewear/eyeglass cases; it has not used its mark in commerce related to jewelry.[41] Shop Paige does not sell clothing or any product line Paige sells.[42] Shop Paige sells jewelry. I have seen no evidence that Paige sells jewelry. In fact, Shop Paige brought action against Paige alleging fraud with the Trademark Trial and Appeal Board to cancel Paige's U.S. trademark registration No. 5798838 related to retail store services that featured jewelry among its list of items sold.[43] Paige informed the Trademark Trial and Appeal Board that "it mistakenly and inadvertently included jewelry in the list of items being sold in its retail stores and that jewelry had not been included for purposes of

---

[39] Vickery Report, 2.

[40] Vickery Report, 32.

[41] Table 1; Registrant's Reply Brief in Support of Its Motion to Dismiss or, Alternatively, for Summary Judgment, *Shop Paige LLC v. Paige, LLC*, United States Patent and Trademark Office before the Trademark Trial and Appeal Board, Proceeding no. 92083405, January 2, 2024.

[42] See, e.g., "About Us," Shop Paige [https://shoppaigeny.com/pages/about-us].

[43] Petition for Cancellation, *Shop Paige LLC v. Paige, LLC*, United States Patent and Trademark Office before the Trademark Trial and Appeal Board, Proceeding no. 92083405, October 6, 2023.



deceiving the Trademark Office" and has requested that jewelry be deleted from the list of items.[44] Further, I am aware of no evidence Paige has produced to show actual confusion related to Shop Paige's alleged infringement. As stated in my discussion of the retail jewelry industry above, most products in the jewelry industry are unbranded, and numerous factors—unrelated to the use of any trademark—drive jewelry sales. Mr. Vickery's choice to include 100 percent of Shop Paige's sales likely overstates the sales related to Shop Paige's alleged infringement of the PAIGE mark.

### ***Failed to Deduct Expenses***

31.    As noted above, Mr. Vickery did not identify or calculate Shop Paige's expenses that should be deducted from the purported unjust sales revenue to determine the appropriate amount of profits to be disgorged. Since Mr. Vickery chose to include 100 percent of Shop Paige's sales, it is appropriate to deduct all expenses Shop Paige incurred to generate those sales. To determine the appropriate amount of deductible expenses, I have analyzed Shop Paige's income statement data over the relevant period and discussed the expenses reflected in these income statements with Ms. Restivo.

32.    For 2020 through 2022 expenses, I relied on Shop Paige's profit and loss statements. For September through December 2018, the full year 2019, and January through May 2023 expenses, I relied on spreadsheet summaries of expenses. While these expenses were provided in a different format and some of them are labeled "approx.," I understand that these expense amounts are accurate.[45] I also note that the average gross margin over the 2020 through 2022 period, the period for which profit and loss statements were provided, was 35.5 percent, while the average gross margin for September through December 2018, the full year 2019, and January through May 2023 was 53.4 percent.[46] This almost 20-percent difference implies that expenses for 2018, 2019, and 2023 are understated. Similarly, per the profit and loss statements, Shop Paige's average net margin for 2020 through 2022 was -3.2 percent while average net margin for September through December 2018, the full year 2019, and

---

[44] Registrant's Reply Brief in Support of Its Motion to Dismiss or, Alternatively, for Summary Judgment, *Shop Paige LLC v. Paige, LLC*, United States Patent and Trademark Office before the Trademark Trial and Appeal Board, Proceeding no. 92083405, January 2, 2024.

[45] Defendant Shop Paige LLC's Responses to Plaintiff Paige, LLC's Requests for Admission (Set One), October 5, 2023, 3; Discussion with Paige Restivo.

[46] Schedule 1.



*Expert Report of Barry L. Bell*                                    *Paige, LLC v. Shop Paige LLC*

January through May 2023 was 4.7 percent, again implying that 2018, 2019, and 2023 expenses are understated.[47]

33.    While I understand that the auto expense line item relates to lease payments for Ms. Restivo's automobile that is used extensively for business purposes, I have not included the auto expense line item as a deductible expense since Ms. Restivo may receive some benefit from personal use of the automobile and I have not been provided mileage logs documenting the percentage of use related to Shop Paige business. After adjusting Shop Paige's expenses to exclude auto expense, I determined that Shop Paige has generated $20,045 in profits from the $2,127,003 in sales ($2,383,598 including shipping and taxes) over the September 2018 through May 2023 period.[48]

### *Conclusion on Disgorgement Claim*

34.    The amount of Shop Paige's purportedly unjust enrichment to be disgorged is at most $20,045. Additionally, I have seen no evidence that 100 percent of Shop Paige's sales from its inception can be attributed to its alleged infringement of the PAIGE mark.

### Overview of Actual Damages Claim

35.    For Paige's claim related to actual damages, Mr. Vickery used a reasonable royalty approach and concluded that the appropriate royalty rate for Shop Paige to license the PAIGE mark was 6 percent of net sales.[49] Applying this royalty rate to the entirety of Shop Paige's reported sales from September 2018 through May 2023, he quantified actual damages of $127,620.[50]

### Issues with Mr. Vickery's Actual Damages Methodology and Conclusions

36.    Mr. Vickery's royalty "analysis" provides no insight into Paige's actual damages, if any, in this matter. His selection of a reasonable royalty remedy appears inappropriate given the facts and circumstances relevant here. Further, even if one assumes that a reasonable royalty construct were

---

[47] Schedule 1.

[48] Schedule 1.

[49] Vickery Report, 3, 33-34.

[50] Vickery Report, 3.



appropriate, Mr. Vickery's methodology and data sources used to reach his royalty conclusion are wholly speculative and rob his conclusion of all credibility.

37.    As discussed further below, Mr. Vickery:

- Offered no evidence of Paige's past licensing, licensing negotiations, or an intent to license;

- Provided no context for the factors the parties would have considered in negotiating a royalty; and

- Identified no basis to establish comparability of the purportedly "comparable" licenses and disclosed no consideration or analysis of comparability.

### *No Evidence of Past Licensing, Licensing Negotiations, or an Intent to License*

38.    Mr. Vickery offered no evidence (and I have seen none) that Paige has ever licensed any trademark or entered into negotiations related to the potential licensing of a mark. Thus, I am aware of no evidence of the terms and conditions Paige might seek for licenses to any of its trademarks. Further, I have seen no evidence that Paige has any intention of licensing or seeking to license any of its trademarks.

39.    I understand that courts in this circuit, as well as the appeals court for the circuit, have found that a reasonable royalty construct is not an appropriate measure of damages where no evidence had been proffered that a party intended to license its trademark.[51] Commenting on reasonable royalties as a measure of actual damages in trademark matters, a Central District of California Court stated:

> "Reasonable royalties, which are a calculation of the hypothetical licensing royalties that an infringer would have paid to the senior owner of a mark, can be recovered as a measure of damages in a trademark infringement case." <u>QS Wholesale, Inc. v. World Marketing, Inc.</u>, 2013 WL 1953719, at *4 (C.D. Cal. May 9, 2013). Reasonable royalties "are a form of damages for lost profits, since they focus on the licensing fees that were never paid by an infringer using a party's

---

[51] See, e.g., Order Granting and Denying Defendant's Post Trial Motions; and Denying Plaintiffs' Post Trial Motions, *Trovan Ltd.et al. v. Pfizer, Inc.*, Case No. 2:98-cv-0094-LGB-Mc (C.D. Cal. May 24, 2000), 33-38.



mark, and like other modes of calculating lost profits, they must be proved with 'reasonable certainty.'" <u>Id.</u> For this reason, "reasonable royalties are most often granted in a trademark context where the parties had a prior licensing agreement . . . or where the plaintiff previously had engaged in the practice of licensing the mark to a third party." <u>Id.</u> (internal citations omitted). "Where a plaintiff has failed to present evidence of an intent to license its trademark, a reasonable royalty analysis necessarily is speculation." <u>Quia Corp. v. Mattel, Inc.</u>, No. C 10-1902-JF-HRL, 2011 WL 2749576, at *6 (N.D. Cal. Jul. 14, 2011).

. . .

In the absence of any evidence of a prior license for the UNTAMED word mark, Lodestar's experts speculate as to the royalty rate the parties might have agreed to in a hypothetical negotiation. But these opinions do not cure Lodestar's failure to provide any evidence of a prior license or negotiations with a third party to license the UNTAMED word mark. Because no evidence supports an award of a reasonable royalty, summary judgment in favor of Bacardi is appropriate on this theory of damages. <u>See</u> <u>Quia Corp.</u>, 2011 WL 2749576, at *7 (finding plaintiff's evidence was "insufficient as a matter of law to support a claim for lost profits in the form of a reasonable royalty" because "the record contain[ed] no evidence of a prior license or licensing negotiations between the parties, a prior license or negotiations with respect to Plaintiff's mark with a third party, or of a plan or timeline for licensing the mark . . ."); <u>Marketquest Group, Inc. v. BIC Corporation</u>, 316 F. Supp. 3d 1234, 1301 (S.D. Cal. 2018) (granting summary judgment on issue of reasonable royalties after finding there was no evidence that the plaintiff ever licensed any of its marks for use by third parties or intended to do so).

. . .

The Court finds that Lodestar has not provided a legitimate basis on which to calculate a reasonable royalty. The record contains no evidence of a prior license or negotiations with respect to Lodestar's UNTAMED word mark with any third party besides Avalon. Nor has Lodestar adduced any evidence of what royalty rate Lodestar would have sought if it had planned to license the UNTAMED word mark.[52]

### *No Context for the Factors Impacting a Royalty Negotiation*

40.   Mr. Vickery's analysis supporting his reasonable royalty damages entailed reviewing a report pulled from RoyaltySource, a third-party database, and calculating average royalty rates reported

---

[52] Order Ruling on Motions for Summary Judgment, *Lodestar Anstalt v. Bacardi & Co. Ltd. et al.*, Case No. 2:16-cv-06411-CAS(FFMx) (C.D. Cal. July 3, 2019), 28-30.



for 16 licenses that included rights to trademarks. The database report included summaries of parties to, and certain terms contained within, the 16 agreements. Mr. Vickery described the entirety of his royalty analysis in two brief paragraphs, stating:

> I reviewed and utilized guideline royalty agreements to determine a reasonable royalty rate for which a potential licensee could utilize the intellectual property (i.e., trademarks) of Paige, LLC. I obtained data from RoyaltySource, a database of key economic terms between licensors and licensees of intellectual property. I identified 16 royalty rate guideline transactions in the Apparel Industry that contained a range of royalty rates (low and high). My analyses yielded the following statistics (see *Schedule 2*, beginning on page 36, for the full dataset):
>
> . . .
>
> **Apparel Brand Related**
>
> | | **Count** | **Minimum** | **Lower Quartile** | **Median** | **Mean** | **Upper Quartile** | **Maximum** |
> |------|------|------|------|------|------|------|------|
> | Low  | 16 | 3.0% | 4.0% | 5.0% | 5.3% | 6.0% | 8.0% |
> | High | 16 | 4.0% | 5.0% | 6.2% | 6.3% | 7.3% | 9.0% |
>
> . . .
>
> As a result of my research and analyses, I determined that the reasonable royalty rate to use in my determination of damages sustained by the Plaintiff was 6.0% of net sales for its trademark. The selection was supported by the market data above.[53]

41.    But identifying minimum and maximum rates and calculating average rates for these 16 agreements in no way informs a determination of the royalty Paige and Shop Paige would have negotiated for Shop Paige to obtain rights to use the PAIGE mark. Mr. Vickery provided no identification or discussion of the factors both parties would have considered in negotiating such a license or how those factors compared to the factors considered by the parties to the 16 purportedly comparable agreements. Further, Mr. Vickery failed to disclose how he selected this 6-percent royalty rate conclusion from the average rates he calculated from the RoyaltySource data. Mr. Vickery's failure to provide this necessary and critical context leaves his royalty conclusion completely unmoored from the

---

[53] Vickery Report, 33-34.



facts of this matter and, as such, does not assist the trier of fact in determining Paige's actual damages, if any.

### No Basis to Establish Comparability of Purportedly Comparable Licenses

42.    Mr. Vickery failed to identify the criteria used to select the 16 purportedly comparable agreements, failed to disclose any meaningful analysis of the agreements, and failed to provide any evidence of any of the agreements' comparability with a hypothetical Paige/Shop Paige license covering the PAIGE mark.

43.    For license agreements to provide any insight into a royalty determination, those licenses must cover sufficiently similar subject matter. Typically, one selects licenses that cover the intellectual property at issue (i.e., the asserted mark(s) or patent(s)). As discussed above, Paige has provided no evidence of any licensing of its mark or intent to do so; thus, no licenses exist to ascertain the royalty Paige's mark would command in a market-based licensing transaction. For the 16 agreements Mr. Vickery identified to have any relevance to a royalty determination in this matter, those agreements must be comparable to the facts and circumstances surrounding a negotiation between Paige and Shop Paige for a license to the PAIGE mark. They are not. And Mr. Vickery offered nothing that would credibly demonstrate comparability. His "analysis" of these agreements is wholly inadequate, and his royalty conclusion is grossly speculative and untethered to the facts and circumstances of this matter.

#### Failed to Identify Selection Criteria

44.    As an initial matter, Mr. Vickery offered no insight into how or by whom the 16 agreements were selected for inclusion in the RoyaltySource report. Presumably Mr. Vickery or someone assisting him established a list of terms or other search criteria and provided that criteria to RoyaltySource staff. But all Mr. Vickery disclosed was the database report itself, leaving it to his readers to guess how he selected these 16 agreements and speculate whether he considered other agreements but decided to exclude them.

#### Failed to Disclose any Meaningful Analysis of the Agreements

45.    After failing to disclose his selection criteria, Mr. Vickery then failed to conduct any meaningful analysis of those agreements. As discussed above, his "analysis" was limited to identifying



the minimum and maximum royalty rates and calculating average royalty rates from the RoyaltySource summary data related to the 16 agreements. Based on his report, he does not appear to have reviewed the actual agreements but only the high-level summary data presented in the RoyaltySource report. His Statement of Data or Information Considered offers little help in this regard as the only entry related to the RoyaltySource data was "Financial and royalty research and analyses."[54]

46.   Even if all 16 agreements were truly comparable in some way to a Paige/Shop Paige hypothetical license (and, to be clear, I have seen no evidence that they are), some of them are likely more comparable than others. Mr. Vickery offered no evidence 1) that he had adequate information to assess comparability, 2) that he made any attempt to do so, or 3) that simple averages of royalty rates identified in the RoyaltySource report provide any meaningful insight into a royalty determination in this matter.

### *Failed to Provide any Evidence of any of the Agreements' Comparability*

47.   ***Considered Limited Data.*** Intellectual property licensing negotiations are often complex and include consideration of many factors related to the licensor and licensee entities, including their industry(ies), company structure, size, level of capitalization, financial metrics such as sales and profitability, and distribution channels, among others. Additionally, numerous factors related to the intellectual property to be licensed and its importance to the licensor's and licensee's businesses are also critical inputs into a license negotiation. Some of these factors include anticipated sales of the products covered by the license, the profitability of those products, the strength of the IP, the scope of the license in terms of rights granted (i.e., exclusive or non-exclusive) and geographic coverage, timing, duration, field of use restrictions, and payment structure.

48.   The limited information provided in the RoyaltySource report did not include sufficient information to ascertain many of these inputs that are critical in a meaningful royalty analysis. Further, because Mr. Vickery appears not to have reviewed the actual agreements but rather just the RoyaltySource report summarizing selected terms of those agreements, one cannot determine the accuracy and completeness of the RoyaltySource report. RoyaltySource relies primarily on U.S. Security and Exchange Commission filings (e.g., 10-Ks and 10-Qs) but also "expand[s] that source to include

---

[54] Vickery Report, 5-6.



periodicals such as newspaper articles, professional journal articles and press releases," to obtain data on the agreements it includes in its database.[55] As RoyaltySource acknowledges, when the actual agreement is not available these sources often provide limited information.[56] The impact of this inexact data-gathering process is obvious from a quick review of the RoyaltySource data Mr. Vickery included in his report. For example, under Royalty Base for the Kasper A.S.L., Ltd. (Anne Klein) agreement, the database report stated, "Royalty: the Sales Royalty set forth in paragraph 9.01 shall be increased to 6%."[57] Based on other information provided in the report, this agreement appears to have amended an earlier agreement between the parties, and this earlier agreement ostensibly included a lower royalty rate than 6 percent. Mr. Vickery simply considered this 6-percent rate without explanation of why this amended agreement with its higher royalty rate was more relevant than the earlier agreement with a lower rate.

49.    ***Ignored Obvious Evidence of a Lack of Comparability.*** Even from the limited data reported for the 16 license agreements, numerous factors demonstrate an obvious lack of comparability between many of these 16 agreements and a hypothetical Paige/Shop Paige license.

50.    For example, as shown in Figure 6 below, all but one of the RoyaltySource agreement dates are drastically different than a hypothetical September 2018 Paige/Shop Paige agreement. Mr. Vickery provided no discussion or analysis to support his implicit assumption that agreements up to seventeen years prior to 2018 are relevant. As discussed further below, Mr. Vickery provided no discussion or analysis to demonstrate the relevance of even the 2017 agreement.

---

[55] "FAQ," RoyaltySource [https://www.royaltysource.com/#].

[56] "FAQ," RoyaltySource [https://www.royaltysource.com/#].

[57] Vickery Report, Schedule 2.



**Figure 6. RoyaltySource Agreement Count by Date** [58]



51.    And the timing of these agreements matters. As shown in Figure 7 below, both the reported low and high royalty rates trended down over the 17-year period covered by the database report.

**Figure 7. RoyaltySource Agreement Royalty Rates** [59]



---

[58] Vickery Report, Schedule 2.

[59] Vickery Report, Schedule 2.



52.   Further, a review of the information provided for the 16 agreements reveals 1) significant differences between the facts and circumstances surrounding these agreements and the hypothetical Paige/Shop Paige license, 2) that the cited royalty rates require significant downward adjustment, and/or 3) that the limited information provided is wholly insufficient to inform a royalty analysis. For example:

- Eleven of the sixteen agreements are exclusive agreements, and the remaining five do not identify scope.[60] Generally, exclusive agreements tend to command a higher royalty rate than non-exclusive agreements. The Paige/Shop Paige agreement would be non-exclusive as Paige would desire to maintain its ability to use the trademark.

- The context for the geography considered among the RoyaltySource agreements is severely lacking in the information provided. Twelve of the sixteen agreements do not define or do not reference the geography considered, and three of the four agreements that do define the geography are broader than the United States.[61] Generally, broader geographic rights result in a higher royalty rate.

- The term of the agreements, without considering any automatic or optional renewal periods, varies as shown in Figure 8 below. Mr. Vickery did not disclose his term assumption associated with the hypothetical Paige/Shop Paige agreement.

---

[60] Schedule 2.

[61] Schedule 2.



**Figure 8. RoyaltySource Agreement Count by Term** [62]



- Some of the licenses included rights to more than one trademark. For example, the entries for the Level Brands, Levi Strauss, Laura Ashley Inc., Kenneth Cole, Everlast, Sandbox Jewelry, and Aris Industries Inc. agreements refer to "marks" (plural); the Isaac Mizrahi agreement identified "two labels," implying at least two licensed marks; and the Xoxo Clothing agreement identified three licensed marks.[63]

- Two of the agreements—Krash Distribution and Gotcha Brands—both included purchase options.[64]

- Several of these agreements covered rights to marks that would appear to be considerably stronger than the PAIGE mark based on the licensor's size, scope of operations, and/or brand awareness. For example, some notable marks include Dockers, Laura Ashley, Kenneth Cole, Isaac Mizrahi, Kathy Ireland, Oscar De La Renta, and Anne Klein.[65] For example, Levi Strauss & Co., owner of the Dockers trademark, states, "[T]he Dockers brand sparked a revolution in the way millions of men dressed around the world [in the 1990s], shifting from the standard issue suit to a more

---

[62] Schedule 2.

[63] Vickery Report, Schedule 2.

[64] Vickery Report, Schedule 2.

[65] Vickery Report, Schedule 2.

casual look."[66] Levi sells Dockers brand products in more than 50 countries as of November 2022, and Dockers accounted for more than $300 million in net revenue during Levi's fiscal year 2022.[67] Also, Xcel Brands, Inc., owner of the Isaac Mizrahi trademark as of 2021, valued its Isaac Mizrahi Brand tradename at $44.5 million as of December 2021.[68]

- The information provided for some of the agreements does not provide sufficient detail to ascertain the intellectual property actually licensed. For example, the entry for the Phat Fashions agreement identified the licensed intellectual property only as "the Property" without disclosure of what assets were included in the license.[69]

- At least one agreement reflected one royalty rate for the initial term but a significantly reduced rate for renewal terms (8 percent versus 5 percent).[70]

- The entry in the Royalty Base field for one agreement (Candies Inc.) stated, "Royalty: 5% royalty and a 2% advertising fee on the net sales of Innovo & Candies goods bearing the Bongo (r) trademark."[71] The Royalty Rate range was listed as 5% and 7%— ignoring that 2 percent was not a royalty but rather specifically related to advertising.

53.   Additionally, in some instances, the cited royalty rates appear inconsistent with other reported data for the same agreement. For example, for the Sandbox Jewelry, LLC agreement, the database report cites a 5-percent royalty rate (as both the low and high rate), but the entry in the Royalty Base field states, "Royalty: Up to 5% of net sales depending on the type of jewelry sold."[72] Based on this statement, the 5-percent rate would represent the highest rate under the agreement, but no

---

[66] Levi Strauss & Co. Form 10-K for the fiscal year ended November 27, 2022, 8, 12-13.

[67] Calculated as $6,168.6 million x 5 percent ≈ $308.4 million. Levi Strauss & Co. Form 10-K for the fiscal year ended November 27, 2022, 8, 47.

[68] Xcel Brands, Inc. Form 10-K for the fiscal year ended December 31, 2021, 11, 52.

[69] Vickery Report, Schedule 2.

[70] See Anthony L & S LLC/Phat Fashions LLC agreement. Vickery Report, Schedule 2.

[71] Vickery Report, Schedule 2.

[72] Vickery Report, Schedule 2.



*Expert Report of Barry L. Bell*                                                            *Paige, LLC v. Shop Paige LLC*

information was provided about the low end of the royalty rate range or what products were subject to each rate.

54.    Further, Mr. Vickery appears to have misidentified the appropriate industries for both Paige and Shop Paige. He identified the relevant industry for Paige as "Women's Clothing Stores in the US" and the relevant industry for Shop Paige as "Online Jewelry & Watch Sales in the US."[73] However, as discussed above, Paige clearly sells clothing for both men and women, and Shop Paige markets and sells its products via a brick-and-mortar retail space as well as online. Significantly, Mr. Vickery also failed to identify the relevant industry for any of the licensors or licensees who were parties to the 16 RoyaltySource agreements that formed the sole basis for his royalty conclusion. It is unclear what impact these errors had on Mr. Vickery's analysis, but these errors do further impugn the credibility and reliability of his royalty conclusion.

55.    Mr. Vickery also failed to properly consider Shop Paige's position as the licensee and how that position compared to the licensees' respective positions in their licensing negotiations. Notably, Mr. Vickery opined to a reasonable royalty of $127,620 despite the fact that Shop Paige reported a net loss of more than $22,000 over the 2020 through 2022 period.[74] Additionally, Mr. Vickery's royalty conclusion was 1.5X Shop Paige's total marketing expenses for 2021 and 2022 underlined combined.[75] Further, his royalty conclusion is more than 35 percent of all of Shop Paige's reported marketing expenses from September 2018 through May 2023.[76]

### *Royalty Damages Conclusion*

56.    Paige has offered no evidence that it has licensed its mark or intended to do so. As such, there is no evidence of the terms at which it would grant such a license. Nothing Mr. Vickery presented corrects this deficit. Mr. Vickery's blind reliance on the limited RoyaltySource data and his failure to investigate the comparability of the facts and circumstances surrounding the 16 purportedly comparable agreements to the hypothetical Paige/Shop Paige license render his royalty conclusion unsupported,

---

[73] Vickery Report, 26-27.

[74] Schedule 1.

[75] $127,620 royalty conclusion ÷ $85,279 marketing expenses in 2021 and 2022 ≈ 1.496. Schedule 1.

[76] $127,620 royalty conclusion ÷ $331,360 total marketing expenses ≈ 38.514 percent. Schedule 1.



speculative, and entirely divorced from the facts of this matter. While courts have acknowledged the acceptability of the use of RoyaltySource data, they have also repeatedly stressed the requirement that the expert relying on that data review sufficient detail to understand the actual license terms (e.g., by reviewing the underlying agreements themselves rather than only the limited data RoyaltySource provides) to demonstrate the comparability of these agreements to the hypothetical license.[77]

### Royalty Damages Overlap with Disgorgement

57.    Mr. Vickery does not disclose whether he views his royalty damages remedy as an alternative to his disgorgement remedy or believes that Paige is entitled to both. Clearly, these remedies are overlapping, not additive.

### Prejudgment Interest

58.    I understand that the appropriateness of prejudgment interest is largely a legal issue. If asked to calculate prejudgment interest in this matter, I would apply an interest rate and compounding method, as determined by the Court, to the final award of damages should that information become available. If an interest rate and compounding method are not provided by the Court, I would provide the Court guidance as to an appropriate rate of prejudgment interest and would calculate the amount of interest based upon the Court's ruling.

## Other Issues

59.    This report represents my analysis, opinions, and conclusions at this time and is based on information available to me as of the date of this report. The citations listed in this report are illustrative, and, as part of my analysis, I have also considered the additional documents and information listed on <u>Exhibit B</u>. I understand that I may be asked to review certain additional information, documents and/or testimony produced subsequent to the issuance of this report. If additional relevant information or testimony becomes available to me, I may find it appropriate to revise or supplement my analysis, opinions, and conclusions, and thus reserve the opportunity to modify or supplement my

---

[77] See, e.g., *Casa Tradicion S.A. de C.V. v. Casa Azul Spirits, LLC*, Civil Action No. H-22-2972 (S.D. Tex. Nov 03, 2023), 6.



report. I may also testify at trial regarding any related matter raised by either party if asked to do so by the Court or the parties' attorneys.

60.    In connection with my anticipated trial testimony in this matter, I may use as exhibits various documents produced in this litigation, which refer or relate to the matters discussed in this report. In addition, I may create or assist in the creation of demonstrative exhibits to assist me in providing testimony. I have not yet selected or created such exhibits.

61.    This report is intended solely for use in the above-referenced litigation and is not to be used for any other purpose.

January 11, 2024

_____

Barry L. Bell



Exhibit A



**Barry L. Bell, MBA**
Managing Director

**1201 Elm Street, Suite 4232**
**Dallas, Texas  75270**
**214.965.8531**
**bbell@ea-us.com**
_____

**Certifications**

Certified Licensing Professional
Certified Patent Valuation Analyst
Certified Fraud Examiner

**Professional Affiliations**

American Bar Association
    Associate Member

Association of Certified Fraud
Examiners

Licensing Executives Society

National Association of Certified
Valuation Analysts
    Practitioner Member

**Education**

M.B.A. with Honors: 2007
Edwin L. Cox School of Business
Southern Methodist University

B.S. – Business Administration
(Finance): 1989
_Magna Cum Laude_
Tennessee Technological
University

**Consulting History**

Echelon Analytics: 2010 – Present

FTI Consulting: 2008 – 2010

Peterson Consulting/Navigant
Consulting: 1991 – 2008

For more than 30 years, Barry Bell has focused primarily on the analysis and quantification of damages in commercial litigation matters.  He is experienced in analyzing complex matters; identifying relevant issues, information and approaches and cogently communicating, via expert reports and testimony, the resulting opinions to interested parties.

Mr. Bell has provided expert testimony in matters before state and federal courts as well as in arbitration. He has provided expert opinions in matters involving allegations of breach of contract; breach of fiduciary duty; fraud; trade secret misappropriation; copyright, patent and trademark infringement; and tortious interference, among others.

Mr. Bell has also led engagements in analyzing damages related to business interruption, dealer termination, product liability, fraudulent conveyances, and professional liability, among others.  He has analyzed and/or presented claims for restitution and for damages under reliance, expectancy (lost profits), reasonable royalty, unjust enrichment, and statutory damages constructs.

Mr. Bell's experience includes engagements in the following industries, among others:

- Architectural Design
- Banking/Financial Services
- Chemicals
- Communication
- Energy
- Entertainment
- Fashion
- Health Care
- High Technology/Internet
- Insurance
- Manufacturing
- Media
- Medical Devices/Pharmaceuticals
- Mining
- Mobile Devices/Applications
- Oil and Gas
- Real Estate
- Retail
- Sports/Fantasy Sports
- Software
- Telecommunications
- Waste Disposal

## Professional Experience

Some examples of Mr. Bell's case experience include:

**Intellectual Property**

### Copyright Infringement

- Analyzed damages related to a national homebuilder's alleged infringement of an architectural design firm's copyrighted floor plans. Analyses included an assessment of the residential floor plan market, including the pricing strategies of the plaintiff and its identified competitors, and a quantification/allocation of the alleged infringer's revenues, costs and profits attributable to the alleged infringement.  (Retained by defendant)



Barry L. Bell

- Analyzed damages related to multiple homebuilders' alleged infringement of copyrighted floor plans. Analyses included quantification of copyright owner's actual damages as well as a critique of defendant experts' opinions related to deductible expenses and allocation of profits to factors other than the copyrighted elements.  (Retained by plaintiff)

- Analyzed a software developer's claim for lost profits, infringer's profits and relief in royalty related to the defendant's alleged infringement of the developer's copyright of forecasting software used in call center management.  (Retained by defendant)

- Analyzed damages due to the alleged copyright infringement of direct mail marketing materials. Analyzed revenues associated with the allegedly infringing marketing materials and quantified deductible costs associated with the identified revenue.  Further, analyzed the impact of the alleged infringement on defendant's profits.  (Retained by defendant)

- Quantified damages to a specialty software company due to the alleged infringement of a copyright and the breach of a licensing agreement by a *Fortune* 5 company.  (Retained by plaintiff)

**Patent Infringement**

- Analyzed damages and provided critique of a patent holder's damages claims related to the alleged infringement of six patents covering certain aspects of the creation of online display advertisements.  Analysis included evaluation of relevant data points, including value indicators of the patent holding entity, comparable licensing transactions, and the cost of non-infringing alternatives.  (Retained by the defendant)

- Calculated lost profits and reasonable royalty damages related to six asserted patents covering aspects of automated self-service key duplication kiosks.  Analyses included determination of causally linked lost sales, calculation of various revenue and profit metrics per key, and review of comparable license agreements.  (Retained by plaintiff)

- Reviewed and provided critique of a patent holder's reasonable royalty damages claim related to ten asserted patents allegedly infringed by various mobile electronic devices including mobile phones, tablets, portable music players/gaming devices, and smart watches.  Analyses also included an affirmative opinion of the appropriate amount of reasonable royalty damages assuming a finding of validity and infringement.  (Retained by defendant)

- Quantified lost profits and reasonable royalty damages in a patent infringement matter involving a patent covering skid-picking machines designed for use on pipeline construction sites.  Analyses included an assessment of market demand, the patent holder's manufacturing and marketing capacity, and determination of lost revenue and incremental profit margin to quantify lost profits.  Further, assessed whether a claim for price erosion was appropriate and supported by available evidence.  Also





quantified reasonable royalty damages both in conjunction with, and as an alternative to, lost profits.  (Retained by plaintiff)

- In a suit brought by a patent aggregator against a large mobile device manufacturer, provided a critique of royalty damages claimed by the holder of patents related to voice over LTE (VoLTE).  Additionally, determined alternative reasonable royalty damages based on comparable license analysis with adjustments to reflect the appropriate technical footprint of the asserted patents and other differences between the real-world agreements and the hypothetical negotiation construct.  (Retained by defendant)

- Analyzed royalty damages claimed by a patent holding company related to a large mobile device manufacturer's alleged infringement of patents covering certain aspects of LTE, including resource allocation between base stations and user equipment.  Rebutted opposing expert's reasonable royalty analysis and conclusion based on the expert's conflation of the asserted patent's purported benefits with the overall benefits of LTE, failure to properly analyze FRAND considerations and non-infringing alternatives, and failure to appropriately analyze license agreements, among other issues.  (Retained by defendant)

- Analyzed damages claimed by a patent holder against a large national retailer involving patents that purportedly optimized customers' online shopping experience.  Analysis included a critique of the patent holder's damages claim that was based on an improper, incomplete, and misleading interpretation of selected web user metrics and other unsupported assertions, including claims of convoyed sales.  Additionally, prepared an alternative damages quantification based on the patent holder's licensing history, the alleged infringer's degree of use of the asserted patents, and other available evidence informing the value of the alleged infringer's use of the technology at issue.  (Retained by defendant)

- Evaluated whether a reactive-liner shaped charge used in oil and gas well completions embodying the teachings of an apparatus patent was commercially successful in matter before the Patent Trial and Appeal Board. (Retained by patent owner)

- Analyzed whether a complainant met the economic prong domestic industry requirements in a Section 337 matter before the International Trade Commission.  The asserted patents covered technology used in scanners and scan engines.  Also evaluated factors related to complainant's request for a cease-and-desist order and the appropriate amount of a bond to cover its alleged harm during the Presidential review period.  (Retained by respondent)

- Analyzed and quantified damages suffered by the holder of a patent covering a method of using reactive-liner charges to perform wellbore perforations in oil and gas wells.  Analysis entailed a quantification of lost profits from lost sales as well as from price erosion due to the infringement. (Retained by plaintiff)



**Barry L. Bell**

- Analyzed damages claimed by the holder of a patent covering a specific arrangement of multiple oil and/or gas wells on a single pad site. Evaluated plaintiff's reasonable royalty damages claim and performed an independent analysis to reach a reasonable royalty damages opinion. (Retained by defendant)

- Analyzed reasonable royalty damages suffered by the holder of a patent covering the organization for accessing internet searches for geographically and topically based information. (Retained by plaintiff)

- Evaluated claims for reasonable royalty damages related to claimed by the holder of a patent covering the process of reformatting an HTML (or desktop) website to an XML site to facilitate viewing and navigation on televisions and mobile devices. Defendant was a national department store retailer. Analysis included the review of numerous license and settlement agreements. (Retained by defendant)

- Analyzed damages claimed by the holder of a patent related to duct couplers used in segmental concrete construction. (Retained by defendant)

- Evaluated damages claimed by a patent holder and its exclusive licensee related to alleged infringement of two patents covering certain aspects of laser ultrasonic testing of composite materials. Plaintiffs also claimed damages due to misappropriation of trade secrets covering certain aspects of their laser ultrasonic testing process. Analyzed claimed lost profits and reasonable royalty damages and performed independent quantification of reasonable royalty damages and trade secret misappropriation damages assuming validity and infringement/misappropriation. (Retained by defendant)

- Analyzed damages claimed by the holder of patents covering the capture and storage of visual images in multiple electronic file formats on smartphones. Issues addressed, among others, included apportionment versus entire market value. (Retained by defendant)

- Determined lost profits and reasonable royalty damages suffered by a patent holder in the technology industry. Analyses involved extensive market as well as fixed and variable cost and profitability analyses of both parties (including foreign parents) in the litigation. (Retained by plaintiff)

- Quantified damages to a medical device manufacturer as the result of alleged patent infringement by a direct competitor related to a medical device used in ACL/PCL reconstruction procedures. Calculated lost profits and royalty damages related to both U.S. and international sales of accused devices and related products. (Retained by plaintiff)

- Analyzed damages claimed by the holder of a patent allegedly covering certain components of "middleware" intended for use in complex data mining systems for the extract, transform and load (ETL) function, among others. Analyzed damages claimed against multiple defendants, who allegedly used the patented technology in disparate software products. (Retained by defendants)



<span style="color:maroon">Barry L. Bell</span>

**Trademark Infringement**

- Analyzed plaintiff's damages claim for disgorgement of infringer's profits related to alleged trademark infringement of five marks in the education industry. Analysis included assessment of a causal nexus between the alleged infringement and claimed damages and a critique of the methodology and conclusions of the claim. (Retained by defendants)

- Analyzed claims for lost profits, unjust enrichment, harm to goodwill, corrective advertising, and irreparable harm to a catering business due to trademark infringement and unfair competition under the Lanham Act and common law unfair competition. (Retained by plaintiff)

- Quantified lost profits and corrective advertising damages suffered by an information technology infrastructure solution and consulting provider due to the infringement of its trademark and unfair competition. (Retained by plaintiff)

- Quantified an e-commerce retailer's damages due to trademark infringement and violations of the Anticybersquatting Consumer Protection Act. Analyses included quantification of infringing sales and plaintiff's lost profits. (Retained by plaintiff)

**Trade Secret Misappropriation**

- Prepared an affirmative damages claim and rebutted plaintiff's damages claim due to alleged misappropriation of trade secrets related to certain functionality within complex life and annuity insurance policy administration software platforms. Affirmative damages were based on the cost to independently develop the purported trade secrets. Plaintiff's damages entailed claims under the cost, income, and royalty approaches. (Retained by defendants)

- Provided a critique of damages claimed by a medical supplies company in a trade secrets matter against a direct competitor and former employees who had taken sales positions with the competitor. (Retained by defendant)

- Evaluated damages suffered by the owner of trade secrets covering the concept and development of second screen technology to facilitate audience engagement during meetings/presentations. Quantified reasonable royalty damages. (Retained by plaintiff)

- Quantified reasonable royalty damages suffered by the provider of cost containment, program integrity, and coordination of benefits solutions in the public and private health insurance market due to trade secrets misappropriation by its primary competitor (among other causes of action). (Retained by plaintiffs)

- Analyzed and prepared rebuttal analyses to a specialty chemical manufacturer's damages claim due to alleged misappropriation of trade secrets related to the manufacturing process for high-purity germane gas used in the production of high technology components such as

5



semiconductors and solar cells.  Plaintiff's claim included lost profits, increased costs, and diminution in value of the trade secrets and the business entity.  (Retained by defendant)

- Analyzed damages to the operator of a free-standing emergency center and a physicians staffing company related to misappropriation of trade secrets and other causes of action, including breach of contract, breach of fiduciary duty, unfair competition, tortious interference, and fraud.  Quantified damages included lost profits, increased expenses, increased advertising expenses, and unjust enrichment.  (Retained by plaintiffs)

- Evaluated damages arising from the misappropriation of trade secrets related to design, pricing, sales and marketing, and customer information in the modular oil and gas processing plant industry.  Quantified damages included analyzing defendants' avoided costs/head start related to the misappropriation.  (Retained by plaintiff)

- Quantified damages to a commercial insurance brokerage due to the misappropriation of trade secrets and other related causes of action, including breach of contract and tortious interference.  Damages included lost profits and a quantification of defendants' profits related to the misappropriation.  (Retained by plaintiff)

- Evaluated claims for damages purportedly suffered by a specialty software provider related to a cash inventory optimization software tool used by financial institutions.  Claimed damages included unjust enrichment. (Retained by defendants)

- Analyzed lost profits damages claimed by plaintiff related to alleged misappropriation of trade secrets (as well as additional causes of action) in the credit monitoring industry.  Additionally, calculated damages related to counter-plaintiff's antitrust claims against counter-defendant.  Performed extensive analyses of industry statistics and trends, market share and the parties' historical and projected sales and profitability.  (Retained by defendant/counter-plaintiff)

- Reviewed and prepared rebuttal analyses to plaintiff's damages claim related to the alleged theft of trade secrets pertaining to coal cleaning technology. Analyses included quantifying the economic impact of the defendant's alleged use of the trade secrets and the lost profits allegedly suffered by the plaintiff.  (Retained by defendants)

- Quantified damages related to the alleged misappropriation of trade secrets dealing with the manufacture of specialized composite materials used in the vehicle armor industry, among other applications.  (Retained by defendant/counterclaimant)

**Breach of Contract**

- Determined whether two parties' offers related to a cross-license for cellular standard essential patents were consistent with fair, reasonable, and non-



Barry L. Bell

discriminatory (FRAND) terms. Further, determined the appropriate range for a FRAND balancing payment under the proposed cross license covering the parties' respective cellular SEP portfolios. The scope of work included review of dozens of license agreements and performing unpacking analyses on the most comparable license agreements to inform the appropriate FRAND royalty range.

- Analyzed damages under breach of contract claims in the medical device industry.  The claims related to alleged violations of sales employees' non-compete and non-solicitation agreements.  Additional claims included breach of fiduciary duty and tortious interference.  Claimed damages included plaintiff's purported lost profits and defendant's purported unjust enrichment.  (Retained by defendant)

- Quantified damages resulting from breach of contract, computer trespass, and other claims related to a medical supply company's senior sales executive moving to a competitor and allegedly engaging in improper conduct to the detriment of his former employer.  Quantified lost profits damages due to lost sales to two large hospital systems.  (Retained by plaintiff)

- Analyzed damages (ranging from multimillion to multibillion-dollar claims) allegedly arising from breaches of contract in over a dozen suits filed by savings and loan associations, their shareholders, and/or their receivers against the U.S. government relative to changes in regulations governing the calculation of regulatory capital. On these engagements, Mr. Bell performed viability assessments and extensively analyzed thrift institutions' capitalization, actual and projected operations (including underwriting, monitoring and internal controls) and profitability. He also directed and performed analyses of asset composition, sources and cost of funding, interest margin and spread, and portfolio risk, as well as other financial performance metrics. (Retained by defendant)

- Quantified damages related to alleged breaches of contract between two providers of specialized software used by financial institutions to manage their depositor overdraft protection programs.  Claims included alleged breach of an exclusive marketing agreement.  Analyses included review of the parties' historical and projected revenues, customer bases, and profitability.  Also included analysis of the economic and regulatory environment over the relevant time period.  (Retained by plaintiff)

- Provided an expert report and arbitration testimony quantifying damages to a publisher due to a breach of contract relative to the distribution of a non-fiction book. (Retained by plaintiff)

- Quantified damages due to a breach of contract and fraud related to the failed implementation of enterprise resource planning software platform for a county government.  Quantified restitution and reliance damages.  (Retained by plaintiff)

- Analyzed damages related to an alleged violation of an exclusive marketing agreement in the insurance industry. (Retained by plaintiff)



- Analyzed and offered expert opinions relative to a wholesaler/retailer's claimed lost profits and increased cost damages allegedly resulting from a breach of contract by an office equipment lessor. (Retained by defendant)

- Provided expert reports and testimony on damages arising from the alleged breach of an asset purchase agreement related to a business acquisition in the transactions processing industry.  The matter also encompassed claims of fraud, breach of fiduciary duty and violations of the Racketeer-Influenced Corrupt Organizations Act (RICO).  Analyses and damages quantification included a calculation of lost profits, diminution in value and unjust enrichment.  (Retained by plaintiffs)

- Analyzed lost profits suffered by an industrial shelving manufacturer resulting from an alleged breach of contract by a manufacturing equipment seller. Issues addressed included lost sales, increased repair and maintenance costs and increased scrap, among others.  (Retained by plaintiff)

**Breach of Fiduciary Duty**

- Quantified damages suffered by the importer of wood flooring products due to breach of fiduciary duty (and other causes of action) related to freight forwarding and brokerage services.  (Retained by plaintiff)

- Analyzed and/or quantified damages related to breach of fiduciary duty claims on numerous matters involving other claims as listed under Breach of Contract, and Trade Secret Misappropriation sections above.  Breach of fiduciary damages constructs have included lost profits, diminution of value, reasonable royalty, and unjust enrichment.  (Retained by plaintiffs)

**Business Interruption/Dealer Termination**

- Analyzed damages related to the termination of a dealer in the building supplies industry. (Retained by defendant)

- Analyzed damages related to a dealer termination in the apparel industry. (Retained by plaintiff)

- Analyzed lost profits suffered by a boutique clothing retailer in a business interruption matter. (Retained by plaintiff)

**Investigations and Fraud**

- In numerous cases, investigated the origination of purported unsafe/unsound loans, letters of credit, and similar transactions due to alleged negligence and/or fraud. Investigations included identification of alleged straw borrowers, self-dealing, and related-party transactions, among others. (Retained by plaintiff)

- Provided an expert report and deposition testimony relative to damages suffered by the acquirers of a specialty chemical sales company due to misrepresentation and fraud by the seller.  (Retained by plaintiff)

- Investigated alleged embezzlement and expense reimbursement fraud by a former officer of a publicly traded gaming company. This investigation involved



Barry L. Bell

a review of company-reimbursed expenses and company credit card transactions, among other transactions. (Retained by plaintiff)

**Partnership Disputes**

- Provided an expert affidavit quantifying damages relative to the alleged breach of a partnership agreement involving ownership stakes in a software company. (Retained by plaintiff)

- Consulted on accounting and valuation issues in a suit involving a natural gas processing operation. Reviewed asset transfers among related entities, the accounting treatment of key transactions, the valuation methodologies used in key transactions and the allocation of partnership funds upon dissolution. (Retained by defendant)

- Analyzed alleged damages related to disputed ownership interest in business entities involved in obtaining oil and gas leases and developing sites to accommodate natural gas wells and pipelines.  Analysis included a valuation of two limited liability companies and analysis of accounting records to determine potential plaintiff contributions to the companies.  (Retained by defendant)

**Product Liability**

- Analyzed claimed damages of over $500 million related to increased employer health insurance costs in a product liability matter. (Retained by defendants)

**Professional Malpractice**

- In numerous cases, determined damages suffered from avoidable transactions due to alleged accounting malpractice. (Retained by plaintiff)

**Bankruptcy Matters**

- Performed analyses of solvency, preference payments, and alleged fraudulent conveyances for a bankrupt international telecommunications company. Analyses included detailed review of and adjustment to the assets and liabilities of multiple subsidiaries, including international subsidiaries, within various layers of the enterprise. (Retained by trustee/plaintiff)

- Analyzed solvency of a large mining operation and whether the company received reasonably equivalent value in numerous transactions.  (Retained by debtor)

- Assisted a telecommunications company debtor in implementing a reorganization plan and monitoring monthly operations. (Retained by unsecured creditors committee)

## Presentations and Publications

- "Economic Remedies for Trade Secret Misappropriation," IncreMental Advantage, January 2023, Live Webcast

9



- "Lost Profits Damages Calculations in Commercial Litigation: Fundamentals and Key Considerations," The Knowledge Group, April 15, 2019, Live Webcast

- "Design Patent Litigation in 2019: Addressing Current Issues and Latest Developments," The Knowledge Group, March 26, 2019, Live Webcast

- "Intellectual Property Valuation and Damages," guest lecturer, McCombs School of Business, The University of Texas at Austin, Management Program (Entrepreneurship Practicum), October 8, 2018

- "Intellectual Property Valuation and Damages," guest lecturer, McCombs School of Business, The University of Texas at Austin, Management Program (New Venture Mechanics), October 9, 2018

- "Lost Profits Damages Calculations: Framework, Principles and Legal Aspects," The Knowledge Group, September 25, 2018, Live Webcast

- "Design Patent Damages: Hot Buttons in 2017 and Beyond," The Knowledge Group, July 24, 2017, Live Webcast

- "The Evolving Landscape in the Calculation of Patent Damages - Reasonable Royalties," The Knowledge Group, February 1, 2017, Live Webcast

- "A Strategic Approach to Post-Judgment Remedies: Identifying and Assessing Important Factors Influencing Ongoing Royalties," HarrisMartin's Intellectual Property Law Conference, June 14-15, 2012, Omni Dallas Hotel

- "Recent Trends in Patent Damages," Spring 2011 CLE Seminar, Tennessee Intellectual Property Law Association

- Barry L. Bell and Ryan N. Herrington, "Avoiding an Open Source Licensing Trainwreck," *Licensing Journal*, Volume 28, No. 10, November/December 2008

- Barry L. Bell, James E. Pampinella and C. Paul Wazzan, "Consideration of Design Around Solutions in Determining Patent Damages," American Bar Association, Section of Litigation, Intellectual Property Litigation Web site, October 2007

- "Update on Patent Damages: Considerations in Determining Royalty-Based Compensation," 12th Annual Advanced Patent Law Institute, The University of Texas School of Law, 2007

- "Recent Developments in Patent Damages," Licensing Executives Society, Dallas/Fort Worth Chapter, 2005

- Editor of "Spotlight on Intellectual Property Damages," a periodic newsletter distributed by Echelon Analytics and made available on the firm's web site, 2019.

## Expert Testimony, 2005 – Present (retaining party underlined)

- *Wavetronix LLC v. Iteris, Inc.*, United States District Court for the Western District of Texas, Case No. 6:21-cv-00899-ADA-DTG – Deposition



- *Dallas Berkshire Partners, Ltd. v. <u>Glass Cellar, LLC and Randall M. Dewitt</u>*, District Court of Dallas County, Texas, 68th Judicial District, Cause No. DC-22-04908 – Declaration

- *ConsumerDirect, Inc. v. <u>Pentius, LLC, Array US, Inc., System Admin, LLC, Callandor, LLC, CTH Skin Corp., Hotbills, LLC, and Does 1 through 10</u>*, United States District Court for the Central District of California, Case No. 8:21-cv-01968 – Deposition, Trial

- *Naar Boven Corporation v. <u>XLR8 Enterprises, LLC</u>*, United States District Court for the Northern District of Texas, Fort Worth Division, Case No. 4:21-cv-00788 – Deposition

- *White Winston Select Asset Funds, LLC and GT Acquisition Group, Inc. v. <u>Good Times Restaurants, Inc.</u>*, United States District Court for the District of Delaware, Case No. 1:19-cv-02092-RGA – Deposition

- *Computer Sciences Corporation v. <u>Tata Consultancy Services Limited, Tata America International Corporation</u> and Doe Defendants 1-10*, United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:19-cv-00970-X – Deposition, Trial

- *<u>Deniece Waidhofer; Margaret McGehee, and Ryuu Lavitz, LLC</u> v. Cloudflare, Inc.; BangBros.com, Inc.; Sonesta Technologies, Inc.; Multi Media LLC; Crakmedia Inc.; and John Does 1-21*, United States District Court for the Central District of California, Civil Action No. 2:20-cv-06979 – Declaration

- *KeyMe, LLC v. <u>The Hillman Group, Inc.</u>*, United States District Court for the District of Delaware, Civil Action No. 19-1539-LPS – Deposition

- *<u>The Hillman Group, Inc.</u> v. KeyMe, LLC*, United States District Court for the Eastern District of Texas, Marshall Division, Civil Action Nos. 2:19-cv-00209-JRG and 2:20-cv-00070-JRG – Trial

- *<u>Murray Walter Pisony</u> v. Commando Construction, Inc. and James McLeod Holdings, Inc.*, United States District Court for the Western District of Texas, Waco Division, Civil Action No. 6:17-cv-00055-ADA – Deposition

- *DePuy Synthes Sales, Inc. and Medical Device Business Services, Inc. v. <u>Orthofix Medical Inc., Orthofix Spinal Implants Inc., Scott Mackey, and Miranda Middleton</u>*, United States District Court for the Eastern District of Texas, Sherman Division, Civil Action No. 4:19-cv-222 – Deposition

- *CXT Systems, Inc. v. <u>J.C. Penney Corporation, Inc.</u>*, United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:18-cv-00233-RWS-RSP – Deposition

- *<u>Thomas Mercer, Trustee for the Mercer Family Trust, d/b/a Andalusian Gate Apartments & Townehomes</u> v. Reconstruction Experts, Inc. v. Medrano Construction*, JAMS Alternative Dispute Resolution, Arbitration Case No. 1310023857 – Deposition and Arbitration



- _Jamex Marketing, LLC_ v. _Whiting Petroleum Corporation and Whiting Oil and Gas Corporation v. James Ballengee_, District Court of Dallas County, Texas, 68th Judicial District, Cause No. DC-18-04574 – Deposition and Declaration

- _William "Max" Duncan, Jr. and Duncan Litigation Investments, LLC_ v. _Robert C. Hilliard and HMG, LLP_, Arbitration Before the Honorable Lisa Blue, Tommy Jacks, and Rick Paul – Arbitration

- _Dunster Live, LLC_ and Quorum Media Group, LLC v. LoneStar Logos Management Company, LLC, et al., District Court of Travis County, Texas, 98th Judicial District, Cause No. D-1-GN-17-001121 – Deposition

- Schlumberger Technology Corporation v. Fergus Hopwood, Phillip Martin, _Helmerich & Payne International Drilling Co., and Helmerich & Payne, Inc.,_ District Court of Fort Bend County, Texas, 434th Judicial District, Cause No. 17-DCV-241894 – Deposition

- glendonTodd Capital LLC v. _Wade Barker, Jefe Plover Interests, Ltd., and Jefe Plover Management, L.L.C.,_ JAMS Ref. No. 1310023085 – Deposition and Arbitration

- _Carol Loper and Associates, Inc. d/b/a CLA USA Property and Casualty Group_ v. _Express Working Capital, LLC d/b/a Caprock Services, et al.,_ District Court for Dallas County, Texas, 116th Judicial District, Cause No. DC-16-01131 – Deposition

- Big B Crane, LLC, et al. v. _J.B. Hunt Transport, Inc.,_ et al., District Court for Dallas County, Texas, 68th Judicial District, Cause No. DC-16-05323 – Deposition

- DynaEnergetics US, Inc., et al. v. _GEODynamics, Incorporated,_ Patent Trial and Appeal Board, Case IPR2017-02008 – Declaration

- _Highland Park Emergency Center, LLC, et al._ v. _Endeavor Medical Systems, L.P., et al._, District Court for Dallas County, Texas, 162nd Judicial District, Cause No. DC-14-08933 – Deposition

- Effective Exploration, LLC v. _BlueStone Natural Resources II, LLC,_ United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:16-cv-00607-RSP – Deposition

- The Fan Expo, LLC v. _National Football League_ and Electronic Arts Inc., District Court of Dallas County, Texas, 44th Judicial District, Cause No. DC-16-04875 – Deposition

- _Design Basics, LLC_ v. Petros Homes, et al., United States District Court for the Northern District of Ohio, Eastern Division, Civil Action No. 1:14-CV-01966 – Deposition

- _GEODynamics, Incorporated_ v. DynaEnergetics US, Inc., et al., United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:15-cv-01546 – Trial

- Bank of Jackson Hole v. Cook GS Investment Partners, LP; Dan Cook, III; and John Doe; _North Cache Investments, LLC_ v. Bank of Jackson Hole, United States



District Court for the District of Wyoming, Civil Action Nos. 14-CV-234-R and 16-CV-51-R – Deposition

- _Tinker, Inc._ v. *Barbara Poteet and Captain Billy Whizzbang's Hamburgers, Inc.,* United States District Court for the Northern District of Texas, Dallas Division, Case No. 3:14-CV-02878 – Trial

- _Sting Soccer Group, LP,_ *et al. v. JPMorgan Chase Bank, N.A.,* United States District Court for the Eastern District of Texas, Sherman Division, Case No. 4:15-CV-127 – Trial

- *United States of America v. _Mattias Tezock,_* United States District Court for the Northern District of Texas, Dallas Division, Case No. 3:14-CR-211 – Affidavit

- *One Technologies, L.P. v. _Profinity, LLC_ and Chad D. Ertel,* District Court for Dallas County, Texas, 14th Judicial District, Cause No. 12-03980-A – Deposition and Trial

- _Extratix.com, LLC_ *v. James S. Kuhn,* District Court for Tarrant County, 348th Judicial District, Cause No. 348-264415-13 – Affidavit

- *PaR Systems, Inc. and Lockheed Martin Corporation v. _iPhoton Solutions, LLC, et al.,_* United States District Court for the Northern District of Texas, Fort Worth Division, Case No. 4:10-CV-00393 – Deposition

- *Len Rao v. _Weekley Homes, LP d/b/a David Weekley Homes; Weekley Homes, LLC d/b/a David Weekley Homes; Weekley Homes Business Trust; Weekley Homes Business Trust; David Weekley_; Randy Braden and The American Arbitration Association,* County Court at Law No. 2, Dallas County, Texas, Cause No. cc-10-0167-B – Deposition

- _Doug Baughman_ *v. CamWest Partners II, LLC, et al.*, District Court for Collin County, Texas, 296th Judicial District, Cause No. 296-05097-2011 – Deposition

- _John M. Floyd & Associates, Inc._ *v. Fiserv Solutions, Inc. d/b/a IntegraSys and d/b/a Summit Information Systems,* District Court for Collin County, Texas, 429th Judicial District, Cause No. 429-03652-2010 – Deposition

- *Prestonwood Tradition, LP v. _Three/Architecture, Inc.,_* District Court for Dallas County, 44th Judicial District, Case No. 10-15277 – Deposition

- *Solavanti Trading, LLC, et al. v. _SLV Elektronik GmbH, et al.,_* District Court for Dallas County, Texas, 68th Judicial District, Case No. 10-03227 – Deposition

- *Garrison Realty, L.P. v. _Fouse Architecture & Interiors, P.C.,_* United States District Court for the Eastern District of Texas, Marshall Division, Case No. 2:10-CV-576 – Trial

- *Voltaix, LLC v. _Metaloid Precursors, Inc., et al.,_* District Court of Kaufman County, Texas, 422nd Judicial District, Cause No. 80351-422 – Deposition

- _Recursion Software, Inc._ *v. Double-Take Software, Inc.*, United States District Court for the Eastern District of Texas, Sherman Division, Case No. 4:10-cv-403 – Deposition



- _Michael J. Kearins, as successor in interest to Pinnacle Interior Elements, Ltd._ *v. Panalpina, Inc.*, United States District Court for the Eastern District of New York, Case No. CV10 – 1198 – Deposition

- *Industrial Laminates/Norplex, Inc. v. Secur\*Holdings, Inc.,* United States District Court for the Northern District of Texas, Dallas Division, Case No. 3:08-CV-361-M – Trial

- *Abraham Ledesma v. D.R. Horton, Inc.,* U.S. District Court for the Western District of Texas, San Antonio Division, Case No. SA-08-CA1028 – Deposition

- _TransFirst Holdings, Inc., TransFirst Merchant Services, Inc., and Payment Resources International, LLC_ *v. Andrew M. Phillips, Dominic J. Magliarditi, John S. Blaugrund, Payment Resources International, SSF Holdings, LLC, DII Investments, Inc., and TP Investments, LLC,* U.S. District Court for the Northern District of Texas, Dallas Division, Case No. 3-06CV2303-P – Deposition and Trial

- *Christian J. Wood v. Cendant Corporation, et al.,* U.S. District Court for the Northern District of Oklahoma, Case No. 03-CV-298-K(M) – Declaration, Deposition, and Trial

- *Nationwide Bi-Weekly Administration, Inc., et al., v. Home Mortgage Services, Inc., et al.,* U.S. District Court for the Southern District of Ohio, Western Division (Dayton), Case No. 3:04cv242 – Deposition

- *Frank Betz Associates, Inc. v. D.R. Horton, Inc., et al.,* U.S. District Court for the Northern District of Georgia, Atlanta Division, Case No. 1:03-CV-2005-ODE – Deposition

Expert Report of Barry L. Bell                                    *Paige, LLC v. Shop Paige LLC*

## Exhibit B.  Information Considered

As of January 11, 2024

**Pleadings and Discovery and Other Legal Filings**

- Complaint, October 26, 2022

- Plaintiff Paige, LLC's First Set of Interrogatories to Defendant Shop Paige LLC, February 15, 2023

- Plaintiff Paige, LLC's First Set of Requests for Production of Documents and Things to Defendant Shop Paige LLC, February 15, 2023

- Defendant Shop Paige LLC's Responses and Objections to Plaintiff Paige, LLC's Requests for Production of Documents to Defendant Shop Paige LLC (Set One), May 15, 2023

- Defendant Shop Paige LLC's Responses and Objections to Plaintiff Paige, LLC's Interrogatories to Defendant Shop Paige LLC (Set One), May 16, 2023

- Defendant Shop Paige LLC's Amended Responses to Plaintiff Paige, LLC's Requests for Production of Documents to Defendant Shop Paige LLC (Set One), June 20, 2023

- Plaintiff Paige, LLC's Second Set of Interrogatories to Defendant Shop Paige LLC, July 20, 2023

- Plaintiff Paige, LLC's Second Set of Requests for Production to Defendant Shop Paige LLC, July 20, 2023

- Order Modifying Scheduling Order, August 22, 2023

- Plaintiff Paige, LLC's Third Set of Interrogatories to Defendant Shop Paige LLC, September 1, 2023

- Plaintiff Paige, LLC's First Set of Requests for Admission to Defendant Shop Paige LLC, September 1, 2023

- Plaintiff Paige, LLC's Third Set of Requests for Production to Defendant Shop Paige LLC, September 1, 2023

- Defendant Shop Paige LLC's Responses and Objections to Plaintiff Paige, LLC's Interrogatories to Defendant Shop Paige LLC (Set Two), September 28, 2023

- Defendant Shop Paige LLC's Responses to Plaintiff Paige, LLC's Requests for Production of Documents to Defendant Shop Paige LLC (Set Two), September 28, 2023

- Defendant Shop Paige LLC's Responses to Plaintiff Paige, LLC's Requests for Production of Documents to Defendant Shop Paige LLC (Set Three), October 5, 2023

- Defendant Shop Paige LLC's Responses to Plaintiff Paige, LLC's Requests for Admission (Set One), October 5, 2023

- Defendant Shop Paige LLC's Responses to Plaintiff Paige, LLC's Interrogatories to Defendant Shop Paige LLC (Set Three), October 11, 2023



**Expert Report of Barry L. Bell**                                          *Paige, LLC v. Shop Paige LLC*

## Exhibit B.  Information Considered

As of January 11, 2024

**Discussions**

- Paige Restivo

**Expert Reports**

- Expert Report of Forrest A. Vickery, October 13, 2023

**Produced Documents**

| | | |
|---|---|---|
| PAIGE000001-001157 | PAIGE001588-001588 | PAIGE001611-001611 |
| PAIGE001158-001566 | PAIGE001589-001589 | PAIGE001612-001612 |
| PAIGE001567-001567 | PAIGE001590-001590 | PAIGE001613-001613 |
| PAIGE001568-001568 | PAIGE001591-001591 | PAIGE001614-001614 |
| PAIGE001569-001569 | PAIGE001592-001592 | PAIGE001615-001615 |
| PAIGE001570-001570 | PAIGE001593-001593 | PAIGE001616-001616 |
| PAIGE001571-001571 | PAIGE001594-001594 | PAIGE001617-001617 |
| PAIGE001572-001572 | PAIGE001595-001595 | PAIGE001618-001618 |
| PAIGE001573-001573 | PAIGE001596-001596 | PAIGE001619-001619 |
| PAIGE001574-001574 | PAIGE001597-001597 | PAIGE001620-001620 |
| PAIGE001575-001575 | PAIGE001598-001598 | PAIGE001621-001621 |
| PAIGE001576-001576 | PAIGE001599-001599 | PAIGE001622-001622 |
| PAIGE001577-001577 | PAIGE001600-001600 | PAIGE001623-001623 |
| PAIGE001578-001578 | PAIGE001601-001601 | PAIGE001624-001624 |
| PAIGE001579-001579 | PAIGE001602-001602 | PAIGE001625-001625 |
| PAIGE001580-001580 | PAIGE001603-001603 | PAIGE001626-001626 |
| PAIGE001581-001581 | PAIGE001604-001604 | PAIGE001627-001627 |
| PAIGE001582-001582 | PAIGE001605-001605 | PAIGE001628-001628 |
| PAIGE001583-001583 | PAIGE001606-001606 | PAIGE001629-001629 |
| PAIGE001584-001584 | PAIGE001607-001607 | PAIGE001630-001630 |
| PAIGE001585-001585 | PAIGE001608-001608 | PAIGE001631-001631 |
| PAIGE001586-001586 | PAIGE001609-001609 | PAIGE001632-001632 |
| PAIGE001587-001587 | PAIGE001610-001610 | PAIGE001633-001633 |



**Expert Report of Barry L. Bell**                                          *Paige, LLC v. Shop Paige LLC*

## Exhibit B.  Information Considered

As of January 11, 2024

- PAIGE001634-001634
- PAIGE001635-001635
- PAIGE001636-001636
- PAIGE001637-001637
- PAIGE001638-001638
- PAIGE001639-001639
- PAIGE001640-001651
- PAIGE001652-001677
- PAIGE001678-001688
- PAIGE001689-001761
- PAIGE001762-001826
- PAIGE001827-001885
- PAIGE001886-001945
- PAIGE001946-002004
- PAIGE002005-002066
- PAIGE002067-002118
- PAIGE002119-002169
- PAIGE002170-002243
- PAIGE002244-002285
- PAIGE002286-002340
- PAIGE002341-002389
- PAIGE002390-002455
- PAIGE002456-002518
- PAIGE002519-002519
- PAIGE002520-002520
- PAIGE002521-002521
- PAIGE002522-002522
- PAIGE002523-002539
- PAIGE002540-002561

- PAIGE002562-002590
- PAIGE002591-002608
- PAIGE002609-002640
- PAIGE002641-002658
- PAIGE002659-002676
- PAIGE002677-002697
- PAIGE002698-002720
- PAIGE002721-002740
- PAIGE002741-002762
- PAIGE002763-002787
- PAIGE002788-002839
- PAIGE002840-002867
- PAIGE002868-002898
- PAIGE002899-002933
- PAIGE002934-002967
- PAIGE002968-003005
- PAIGE003006-003030
- PAIGE003031-003067
- PAIGE003068-003104
- PAIGE003105-003130
- PAIGE003131-003157
- PAIGE003158-003188
- PAIGE003189-003204
- PAIGE003205-003223
- PAIGE003224-003253
- PAIGE003254-003285
- PAIGE003286-003310
- PAIGE003311-003330
- PAIGE003331-003354

- PAIGE003355-003386
- PAIGE003387-003417
- PAIGE003418-003438
- PAIGE003439-003469
- PAIGE003470-003505
- PAIGE003506-003549
- PAIGE003550-003575
- PAIGE003576-003601
- PAIGE003602-003615
- PAIGE003616-003640
- PAIGE003641-003657
- PAIGE003658-003679
- PAIGE003680-003695
- PAIGE003696-003725
- PAIGE003726-003752
- PAIGE003753-003776
- PAIGE003777-003790
- PAIGE003791-003808
- PAIGE003809-003845
- PAIGE003846-003861
- PAIGE003862-003885
- PAIGE003886-003905
- PAIGE003906-003925
- PAIGE003926-003948
- PAIGE003949-003981
- PAIGE003982-004003
- PAIGE004004-004029
- PAIGE004030-004074
- PAIGE004075-004093



**Expert Report of Barry L. Bell**                                        *Paige, LLC v. Shop Paige LLC*

## Exhibit B.  Information Considered

As of January 11, 2024

- PAIGE004094-004115
- PAIGE004116-004141
- PAIGE004142-004167
- PAIGE004168-004186
- PAIGE004187-004204
- PAIGE004205-004226
- PAIGE004227-004256
- PAIGE004257-004277
- PAIGE004278-004298
- PAIGE004299-004324
- PAIGE004325-004351
- PAIGE004352-004375
- PAIGE004376-004420

- PAIGE004421-004435
- PAIGE004436-004473
- PAIGE004474-004489
- PAIGE004490-004507
- PAIGE004508-004529
- PAIGE004530-004553
- PAIGE004554-004574
- PAIGE004575-004612
- PAIGE004613-004626
- PAIGE004627-004648
- PAIGE004649-004670
- PAIGE004671-004698
- PAIGE004699-004721

- PAIGE004722-004737
- PAIGE004738-004789
- PAIGE004790-004821
- PAIGE004822-004875
- PAIGE004876-004926
- PAIGE004927-004931
- PAIGE004932-004974
- PAIGE004975-005038
- PAIGE005039-005078
- PAIGE005079-005079
- SPNY 000001-000198
- SPNY 000199-000635
- SPNY 000636-000640

### ***Non-Bates Stamped Documents***

- 9.22.2022 C&D Letter(170489671.1).pdf
- 2018 SHOP PAIGE EXPENSES _ PROFIT - Sheet1(170492406.1).pdf
- 2023 SHOP PAIGE EXPENSES - Sheet1.pdf

### **Information Gathered Independently**

- "About Us," Shop Paige [https://shoppaigeny.com/pages/about-us]
- "About," Paige [https://www.paige.com/about]
- "Apparel: market data & analysis," 2023, Statista [https://www.statista.com/study/55501/apparel-market-data-and-analysis/]
- "FAQ," RoyaltySource [https://www.royaltysource.com/#]
- "Homepage," Paige [https://www.paige.com/]
- "Homepage," Shop Paige [https://shoppaigeny.com/]
- "Locations," Shop Paige [https://shoppaigeny.com/pages/locations]
- "Market Insights: Apparel United States," Statista [https://www.statista.com/outlook/cmo/apparel/united-states]



**Expert Report of Barry L. Bell**                                    *Paige, LLC v. Shop Paige LLC*

## Exhibit B.  Information Considered

As of January 11, 2024

- "Retail sales of jewelry in the United States from 2006 to 2022," Statista [https://www.statista.com/statistics/982039/retail-sales-jewelry-us/]

- "Visit Us," Paige [https://www.paige.com/stores]

- 15 U.S.C. § 1117(a)

- American Eagle Outfitters, Inc. Form 10-K for the fiscal year ended January 28, 2023

- Birks Group Inc. Form 10-K for the fiscal year ended March 25, 2023

- *Casa Tradicion S.A. de C.V. v. Casa Azul Spirits, LLC*, Civil Action No. H-22-2972 (S.D. Tex. Nov 03, 2023)

- Levi Strauss & Co. Form 10-K for the fiscal year ended November 27, 2022

- Order Granting and Denying Defendant's Post Trial Motions; and Denying Plaintiffs' Post Trial Motions, *Trovan Ltd.et al. v. Pfizer, Inc.*, Case No. 2:98-cv-0094-LGB-Mc (C.D. Cal. May 24, 2000)

- Order Ruling on Motions for Summary Judgment, *Lodestar Anstalt v. Bacardi & Co. Ltd. et al.*, Case No. 2:16-cv-06411-CAS(FFMx) (C.D. Cal. July 3, 2019)

- Petition for Cancellation, *Shop Paige LLC v. Paige, LLC*, United States Patent and Trademark Office before the Trademark Trial and Appeal Board, Proceeding no. 92083405, October 6, 2023

- Registrant's Reply Brief in Support of Its Motion to Dismiss or, Alternatively, for Summary Judgment, *Shop Paige LLC v. Paige, LLC*, United States Patent and Trademark Office before the Trademark Trial and Appeal Board, Proceeding no. 92083405, January 2, 2024

- Signet Jewelers Limited Form 10-K for the fiscal year ended January 28, 2023

- The Gap, Inc. Form 10-K for the fiscal year ended January 28, 2023

- United States Patent and Trademark Office, Trademark Electronic Search System report [https://tmsearch.uspto.gov/search/search-information]

- Xcel Brands, Inc. Form 10-K for the fiscal year ended December 31, 2021



*Expert Report of Barry L. Bell*                                                                                          *Paige, LLC v. Shop Paige LLC*

**Schedule 1. Shop Paige LLC Profit and Loss Summary**
September 2018 through May 2023

| | 2018 $ | 2018 % | 2019 [1] $ | 2019 [1] % | 2020 $ | 2020 % | 2021 $ | 2021 % | 2022 $ | 2022 % | 2023 $ | 2023 % | Total $ | Total % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | | | | | | | |
| Gross Sales | $11,306 | 107.1% | $61,209 | 106.8% | $924,427 | 106.3% | $881,270 | 106.6% | $489,865 | 112.1% | $204,590 | 111.7% | $2,572,668 | 107.9% |
| Discounts | (2,133) | -20.2% | (10,334) | -18.0% | (143,410) | -16.5% | (128,774) | -15.6% | (87,134) | -19.9% | (34,519) | -18.9% | (406,303) | -17.0% |
| Returns | (55) | -0.5% | (439) | -0.8% | (14,769) | -1.7% | (11,035) | -1.3% | (10,043) | -2.3% | (3,022) | -1.7% | (39,362) | -1.7% |
| **Net Sales** | **$9,118** | **86.4%** | **$50,436** | **88.0%** | **$766,249** | **88.1%** | **$741,462** | **89.7%** | **$392,688** | **89.9%** | **$167,050** | **91.2%** | **$2,127,003** | **89.2%** |
| Shipping | 739 | 7.0% | 3,398 | 5.9% | 72,036 | 8.3% | 53,117 | 6.4% | 25,000 | 5.7% | 7,324 | 4.0% | 161,615 | 6.8% |
| Tax | 697 | 6.6% | 3,456 | 6.0% | 31,015 | 3.6% | 31,892 | 3.9% | 19,192 | 4.4% | 8,728 | 4.8% | 94,980 | 4.0% |
| **Total Sales** | **$10,554** | **100.0%** | **$57,291** | **100.0%** | **$869,300** | **100.0%** | **$826,471** | **100.0%** | **$436,880** | **100.0%** | **$183,102** | **100.0%** | **$2,383,598** | **100.0%** |
| **Cost of Goods Sold** | | | | | | | | | | | | | | |
| Purchases [2] | 6,000 | 56.8% | 20,000 | 34.9% | 470,000 | 54.1% | 442,398 | 53.5% | 274,989 | 62.9% | 62,500 | 34.1% | 1,275,887 | 53.5% |
| W-2 Labor and Contractors [3] | - | 0.0% | 1,500 | 2.6% | 9,555 | 1.1% | 22,722 | 2.7% | 46,122 | 10.6% | 20,833 | 11.4% | 100,732 | 4.2% |
| Commissions | - | 0.0% | - | 0.0% | 25,550 | 2.9% | 24,016 | 2.9% | 11,955 | 2.7% | - | 0.0% | 61,521 | 2.6% |
| **Total Cost of Goods Sold** | **6,000** | **56.8%** | **21,500** | **37.5%** | **505,105** | **58.1%** | **489,136** | **59.2%** | **333,066** | **76.2%** | **83,333** | **45.5%** | **$1,438,140** | **60.3%** |
| **Gross Profit** | **$4,554** | **43.2%** | **$35,791** | **62.5%** | **$364,195** | **41.9%** | **$337,335** | **40.8%** | **$103,814** | **23.8%** | **$99,769** | **54.5%** | **$945,457** | **39.7%** |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Marketing [4] | 500 | 4.7% | 21,000 | 36.7% | 189,581 | 21.8% | 63,279 | 7.7% | 22,000 | 5.0% | 35,000 | 19.1% | 331,360 | 13.9% |
| Auto [5] | - | 0.0% | 800 | 1.4% | 9,550 | 1.1% | 12,251 | 1.5% | 8,556 | 2.0% | 5,000 | 2.7% | 36,157 | 1.5% |
| Communications | - | 0.0% | - | 0.0% | 4,150 | 0.5% | 4,554 | 0.6% | 1,440 | 0.3% | - | 0.0% | 10,144 | 0.4% |
| Insurance | - | 0.0% | - | 0.0% | 7,150 | 0.8% | 7,568 | 0.9% | 4,555 | 1.0% | - | 0.0% | 19,273 | 0.8% |
| Internet and Computer | - | 0.0% | - | 0.0% | 3,550 | 0.4% | 6,537 | 0.8% | 1,320 | 0.3% | - | 0.0% | 11,407 | 0.5% |
| Laundry and Cleaning | - | 0.0% | - | 0.0% | 875 | 0.1% | 913 | 0.1% | 375 | 0.1% | - | 0.0% | 2,163 | 0.1% |
| Legal and Professional [6] | - | 0.0% | - | 0.0% | 500 | 0.1% | 26,100 | 3.2% | 20,150 | 4.6% | 12,500 | 6.8% | 59,250 | 2.5% |
| Meals & Entertainment [7] | - | 0.0% | 200 | 0.3% | - | 0.0% | 12,124 | 1.5% | 2,575 | 0.6% | 1,000 | 0.5% | 15,899 | 0.7% |
| Postage and Shipping [8] | 2,200 | 20.8% | 8,000 | 14.0% | 72,036 | 8.3% | 24,973 | 3.0% | 23,125 | 5.3% | 18,333 | 10.0% | 148,667 | 6.2% |
| Rents [9] | - | 0.0% | 1,800 | 3.1% | 21,600 | 2.5% | 42,000 | 5.1% | 42,000 | 9.6% | 17,500 | 9.6% | 124,900 | 5.2% |
| Repairs & Maintenance | - | 0.0% | - | 0.0% | - | 0.0% | 4,500 | 0.5% | - | 0.0% | - | 0.0% | 4,500 | 0.2% |
| Office and Supplies [10] | 1,000 | 9.5% | 1,000 | 1.7% | 12,600 | 1.4% | 36,325 | 4.4% | 12,055 | 2.8% | 5,000 | 2.7% | 67,980 | 2.9% |
| Travel | - | 0.0% | - | 0.0% | 9,600 | 1.1% | 11,789 | 1.4% | 3,150 | 0.7% | - | 0.0% | 24,539 | 1.0% |
| Uniforms [11] | - | 0.0% | 500 | 0.9% | 6,000 | 0.7% | 6,135 | 0.7% | 6,250 | 1.4% | 2,500 | 1.4% | 21,385 | 0.9% |
| Utilities | - | 0.0% | - | 0.0% | - | 0.0% | 3,682 | 0.4% | 2,700 | 0.6% | - | 0.0% | 6,382 | 0.3% |
| Taxes & Licenses | - | 0.0% | - | 0.0% | 31,015 | 3.6% | 28,916 | 3.5% | 17,632 | 4.0% | - | 0.0% | 77,563 | 3.3% |
| **Total Operating Expenses** | **$3,700** | **35.1%** | **$33,300** | **58.1%** | **$368,207** | **42.4%** | **$291,646** | **35.3%** | **167,883** | **38.4%** | **96,833** | **52.9%** | **$961,569** | **40.3%** |
| **Net Income** | **$854** | **8.1%** | **$2,491** | **4.3%** | **($4,012)** | **-0.5%** | **$45,689** | **5.5%** | **($64,069)** | **-14.7%** | **$2,935** | **1.6%** | **($16,112)** | **-0.7%** |
| **Net Income (excluding Auto)** | **$854** | **8.1%** | **$3,291** | **5.7%** | **$5,538** | **0.6%** | **$57,940** | **7.0%** | **($55,513)** | **-12.7%** | **$7,935** | **4.3%** | **$20,045** | **0.8%** |



**Schedule 1.  Shop Paige LLC Profit and Loss Summary**
September 2018 through May 2023

Notes:

[1] I understand that while the document identifying 2019 expenses includes references to "approx," the reported expenses are accurate. Defendant Shop Paige LLC's Responses to Plaintiff Paige, LLC's Requests for Admission (Set One), October 5, 2023, 3.

[2] Includes "INVENTORY" for 2018, 2019, and 2023 and "Purchases" for 2020 through 2022. The 2023 inventory amount was provided on an annual basis and, therefore, is prorated by 41.7 percent (5 months ÷ 12 months).

[3] Includes "ASSISTANT PAY" for 2019 and 2023 and "W-2 Labor and Contractors" for 2020 through 2022. 2023 assistant pay was provided on an annual basis and, therefore, is prorated by 41.7 percent (5 months ÷ 12 months).

[4] Includes "INFLUENCER MARKETING" for 2018; "MARKETING ADS" and "MARKETING AGENCY FEE" for 2019 and 2023; and "Marketing" for 2020 through 2022. 2023 marketing ads and marketing agency fee were provided on a monthly basis and, therefore, is multiplied by 5 months.

[5] Includes "GAS / CAR EXPENSES" for 2019 and 2023 and "Auto" for 2020 through 2022. 2023 gas/car expenses was provided on a monthly basis and, therefore, is multiplied by 5 months.

[6] Includes "Legal and Professional" for 2020 through 2022 and "ATTORNEY FEES" for 2023. 2023 attorney fees was provided on an annual basis and, therefore, is prorated by 41.7 percent (5 months ÷ 12 months).

[7] Includes "LUNCH FOR ASSISTANT" for 2019 and 2023 and "Meals & Entertainment" for 2021 and 2022. 2023 lunch for assistant was provided on a monthly basis and, therefore, is multiplied by 5 months.

[8] Includes "SHIPPING COSTS" and "PACKAGING" for 2018, 2019, and 2023 and "Postage and Shipping" for 2020 through 2022. 2023 shipping costs was provided on an annual basis and, therefore, is prorated by 41.7 percent (5 months ÷ 12 months) 2023 packaging was provided on a monthly basis and, therefore, is multiplied by 5 months.

[9] Includes "OFFICE RENT" for 2019 and 2023 and "Rents" for 2020 through 2022. 2023 office rent was provided on a monthly basis and, therefore, is multiplied by 5 months.

[10] Includes "OFFICE SUPPLIES" for 2018, 2019, and 2023 and "Office and Supplies" for 2020 through 2022. 2023 office supplies was provided on a monthly basis and, therefore, is multiplied by 5 months.

[11] Includes "WORK ATTIRE" for 2019 and 2023 and "Uniforms" for 2020 through 2022. 2023 work attire was provided on a monthly basis and, therefore, is multiplied by 5 months.

Sources:

Shop Paige Profit and Loss Statement for the Twelve Months Ended December 31, 2020 [SPNY 000176];

Shop Paige Profit and Loss Statement for the Twelve Months Ended December 31, 2021 [SPNY 000174];

Shop Paige Profit and Loss Statement for the Twelve Months Ended December 31, 2022 [SPNY 000175];

2018 Shop Paige Expenses [2018 SHOP PAIGE EXPENSES _ PROFIT - Sheet1(170492406.1).pdf]; 2019 Shop Paige Expenses [SPNY 000183]; 2023 Shop Paige Expenses [2023 SHOP PAIGE EXPENSES - Sheet1.pdf];

Shop Paige Total Sales, 2018 through 2023 [SPNY 000184]



Expert Report of Barry L. Bell

*Paige, LLC v. Shop Paige LLC*

Schedule 2. Summary of Mr. Vickery's RoyaltySource Agreements

| Agreement Date | Licensee | Licensor | Exclusivity | Geography | Term | Licensed Product | Other Terms |
|---|---|---|---|---|---|---|---|
| 6/27/2017 | Loose Leaf Eyewear And Accessories LLC | Level Brands, Inc. Encore Endeavor 1, LLC; I J M1, LLC; Level Beauty Group, Inc. | | United States, Mexico, and Canda | 5 years with automatic 1-year renewal periods | Men's fashion eyewear | Sale, marketing, and distribution through approved distribution channels |
| 7/23/2012 | Genesco Inc | Levi Strauss & Co | Exclusive | Undefined | 2.9 years [1] | Undefined | Amendment to a prior agreement of unknown date<br><br>Manufacture, advertising, distribution, and sale to Approved Retailers for resale<br><br>No context for royalty rate range |
| 7/1/2012 | Anthony L & S LLC | Phat Fashions LLC | Exclusive | Undefined | 5.6 years, renewal terms undefined [2] | Undefined | |
| 1/19/2010 | Signature Eyewear Inc | Laura Ashley Inc | Exclusive related to manufacture, market, sell, and distribute<br><br>Non-exclusive related to advertising and promotion | Undefined | 2 years with the right to a 3-year extension | Ophthalmic frames for prescription eyeglasses, sunglasses, non-prescription readers, eyeglass cases and other accessories and related items | |
| 9/26/2007 | Bernard Chaus Inc | Kenneth Cole Productions (Lic), Inc. | Exclusive | Undefined | 1 year | Undefined wholesale Products | No context for "in amounts to be determined by Licensor"<br><br>No context for 5% royalty rate |
| 3/1/2006 | Fashion House Holdings Inc Kimbell Decar Corp; Tangibledata Inc; Tdi Holding Corp; The Fashion House Inc | Isaac Mizrahi | | United States | 5.1 years with a 5-year renewal option [3] | Footwear collection | Two branded labels (Licensor line and a new couture brand) |
| 1/1/2006 | Jacques Moret Inc | Everlast Worldwide Inc Active Apparel Group Inc | Exclusive | Undefined | 4 years | Undefined | |
| 5/1/2005 | House Of Taylor Jewelry, Inc. Nurescell Inc | Sandbox Jewelry, LLC | Exclusive | | 7 years and renewable for two additional 7-year terms | Jewelry, including gold, silver, diamond, pearl and semi-precious jewelry | Royalty rate is up to 5% of net sales depending on the type of jewelry sold |
| 1/24/2005 | The Fashion House Inc Fashion House Holdings Inc; Kimbell Decar Corp; Tangibledata Inc; Tdi Holding Corp | Oscar De La Renta Ltd | Exclusive | Undefined | 5 years | Women's footwear of all kinds | Grant for Design Specification and the Licensed Mark |
| 11/24/2003 | Bib Ltd Adarna Energy Corp; Bib Holdings Ltd; Ecosystem Corp; Ecosystem Technologies LLC; Gs Energy Corp; Incode Technologies | Mark Tm LLC | Exclusive | Undefined | 5.4 years [4] | Undefined | |
| 10/21/2003 | Total Sports Distribution Inc Aussie Apparel Group Ltd; Bluetorch, Inc.; Global Beverage Solutions, Inc.; | Krash Distribution Inc | | United States, Mexico and Canada | 3.5 years | Undefined | License Agreement entered into with an Option to Purchase Agreement |
| 9/8/2003 | Unboxed Distribution Inc Aussie Apparel Group Ltd; Bluetorch, Inc.; Global Beverage Solutions, Inc.; | Gotcha Brands Inc | | United States, Mexico and Canada | 3.33 years with three automatic 6-year term renewals | Undefined | License Agreement entered into with an Option to Purchase Agreement |
| 4/1/2003 | Innovo Group Inc Innovo Azteca Apparel Inc.; Innovo Inc; Joe's Jeans Inc.; Nasco Products International Inc | Candies Inc Iconix Brand Group, Inc. | Exclusive | | 4 years | Bags and small leather/PVC goods | Extension of prior agreement<br><br>7% royalty is based on a 5% royalty plus 2% advertising fee |
| 6/1/2002 | Adamson Apparel Inc | Xoxo Clothing Company, Inc, Bp Clothing, Inc & Europe Craft Imports, Inc (Subsidiaries Of Aris Industries, Inc) | Exclusive | | 1.25 years with automatic renewal for a 1-year term | Women's, men's, and children's clothing, jeanswear, and sportwear for XOXO trademark and Members Only<br><br>Undefined for the Baby Phat trademark | Includes XOXO trademark, Members Only trademark, and Baby Phat trademark |
| 3/1/2002 | Maxwell Shoe Co Inc | Kasper A.S.L., Ltd. (Anne Klein) | | | 5 years | Shoes | Extension of prior agreement |
| 1/1/2001 | Grupo Extra Of New York Inc | Aris Industries Inc, Xoxo Clothing Company Inc, Bp Clothing Company Inc And Europe Craft Imports Inc | Exclusive | Undefined | 5 years | Undefined, but Licensee is in the business of manufacturing, selling and distributing, among other products, sportswear, outerwear, golf wear and denim bottoms | No context for royalty rate range |

Notes:
[1] Calculated as 2 years + ( 11 months ÷ 12 months ).
[2] Calculated as 5 years + ( 7 months ÷ 12 months ).
[3] Calculated as 5 years + ( 1 month ÷ 12 months ).
[4] Assumes that the agreement date is the same as the execution date. Calculated as 1,985 days ÷ 365 days per year.
Source: Vickery Report, Schedule 2

